Present: Carrico, C.J., Lacy, Hassell, Keenan, Kinser, and
Lemons, JJ., and Poff, S.J.

JOHN YANCEY SCHMITT

v.  Record No. 003010    OPINION BY JUSTICE BARBARA MILANO KEENAN
     Record No. 010007                   June 8, 2001

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
William R. Shelton, Judge

In these appeals, we review the capital murder conviction
and death sentence imposed on John Yancey Schmitt, along with
his several non-capital convictions.

I.  PROCEEDINGS

Schmitt was indicted for capital murder based on the
willful, deliberate, and premeditated killing of Earl Shelton
Dunning during the commission of a robbery, in violation of Code
§ 18.2-31(4).  Schmitt also was indicted for armed entry of a
bank with the intent to commit larceny, in violation of Code
§ 18.2-93; two counts of robbery, in violation of Code § 18.2-
58; and three counts of use of a firearm, in violation of Code
§ 18.2-53.1.

In the first stage of a bifurcated trial conducted under
Code § 19.2-264.3, a jury convicted Schmitt of all the offenses
charged.  In the penalty phase of the trial, the jury fixed his
punishment for capital murder at death based on a finding of
"future dangerousness," and for the other offenses at

imprisonment for a total of 118 years.  The trial court

sentenced Schmitt in accordance with the jury verdict.

We consolidated the automatic review of Schmitt's death

sentence with his appeal of the capital murder conviction.  Code

§ 17.1-313(F).  We also certified Schmitt's appeal of his

convictions for the non-capital offenses from the Court of

Appeals and consolidated that appeal with his capital murder

appeal.  Code § 17.1-409.

## II.  GUILT PHASE EVIDENCE

We will state the evidence presented at trial in the light

most favorable to the Commonwealth, the prevailing party in the

trial court.  Burns v. Commonwealth, 261 Va. 307, 313, 541

S.E.2d 872, 877 (2001); Lovitt v. Commonwealth, 260 Va. 497,

502, 537 S.E.2d 866, 870 (2000).  On February 17, 1999, Earl

Shelton Dunning was shot and killed while working as a security

guard at the Bon Air branch of NationsBank (the bank) on Buford

Road in Chesterfield County.  About a month before Dunning was

killed, Schmitt had robbed this same bank and, after that

robbery, the bank had hired Dunning to work as a security guard.

Shortly after 1:00 p.m. on February 17, 1999, a man entered

the bank wearing dark sunglasses and a bulky jacket.  He kept

his head lowered and appeared to scan the interior of the bank.

Bank manager Sara Parker-Orr testified that she was "nervous"

about this man because he was wearing sunglasses inside the bank

2

on a "really cloudy day." Dunning was outside the bank and, after the man went inside, Dunning entered the bank and walked across the lobby to stand at the end of the "teller line" in which customers were waiting.

The man stood in the teller line behind several customers. Parker-Orr watched him leave his place in line and walk toward Dunning. When the man was within "a foot or so" of Dunning, Parker-Orr heard two gunshots and then heard someone scream, "[G]et down, get down."

The man next approached Parker-Orr's teller window and banged on the counter yelling, "Money, give me money," and "[I]f I don't get money, I'm going to kill everybody." Parker-Orr opened her cash drawer and threw money into a black plastic bag that the robber was holding.

The robber continued to bang on the counter demanding "more money." He announced that he would give the tellers "ten seconds" to give him more money, and began counting backward from the number "ten." By the time he reached "nine," teller Marlene Austin was "throwing money in the bag." Parker-Orr also gave him money from a third teller's drawer. When she told the robber that she had no more money to give him, the robber left the bank.

The bank's security camera system recorded photographs of Schmitt approaching the end of the teller counter and standing

at a teller window holding a bag and pointing a gun.  None of the witnesses who testified at trial saw the actual shooting of Dunning, and the shooting was not recorded by the bank's security camera system.  However, Parker-Orr, Austin, and Kelli Konstaitis, another teller, all identified a photograph of Schmitt recorded by the bank's security camera system as depicting the man who robbed the bank that day.

After Schmitt left the bank, witnesses telephoned the "911" emergency response number and attended to Dunning, who was lying on the floor.  By the time emergency medical personnel arrived, Dunning was dead.  The witnesses in the bank testified that they did not touch or see anyone else touch Dunning's gun or its holster.  Dunning's gun was found in its holster, which was closed and snapped.

An autopsy revealed that Dunning was killed as a result of a gunshot wound to his chest.  The bullet entered the right side of Dunning's chest, causing significant injuries to the aorta, and exited from the right side of his back.

After the murder and robbery, Schmitt registered at a Williamsburg hotel the same day under the name "R. Napier."  The hotel desk clerk testified that Schmitt asked for directions to the local shopping areas, and that when Schmitt later returned to the hotel, his hair was a different color.  Schmitt paid cash for a three-day stay at the hotel.

4

Captain Karl S. Leonard of the Chesterfield County Police Department identified Schmitt after reviewing the photographs taken by the bank's security camera system. Two days after the murder and robbery, on February 19, 1999, Leonard learned where Schmitt was staying in Williamsburg. The James City County Tactical Team surrounded Schmitt's hotel room, and a crisis negotiator, Lieutenant Diane M. Clarcq of the James City County Police Department, attempted to persuade Schmitt to surrender. About 10:30 a.m. the following morning, Schmitt surrendered and was taken into police custody.

Leonard obtained a search warrant for Schmitt's hotel room, where a satchel, a handgun, a box of shotgun shells, a black leather jacket, and a variety of newly purchased clothing items were seized. Inside the satchel was $27,091 in cash, most of which still bore "bank bands" identifying the money as coming from the Bon Air branch of NationsBank.

John H. Willmer, a firearms and tool mark examiner employed by the Virginia Division of Forensic Science, qualified as an expert witness on the subject of firearms. Willmer testified that he examined the handgun found in Schmitt's hotel room and the cartridge casings and bullets found in the bank. He stated that based on his examination, the cartridge casings and bullets had been fired from this handgun. Willmer also tested the handgun and items of Dunning's clothing to establish the

5

distance of the firearm from Dunning at the time of the shooting. Based on these tests, Willmer concluded that the pattern of gunpowder residue found on Dunning's clothing indicated that when Dunning was shot, the distance between him and the firearm muzzle was between 12 and 36 inches.

### III. PENALTY PHASE EVIDENCE

During the penalty phase of the trial, the Commonwealth presented evidence of Schmitt's criminal record. Between 1992 and 1996, Schmitt was convicted twice of possession of marijuana with the intent to distribute, and also had convictions of receiving stolen property, possession of a firearm by a convicted felon, and possession of marijuana. Schmitt was on probation for some of these offenses at the time of the capital murder and robbery. He had failed to keep the conditions of his probation requiring him to have regular drug tests and to meet with his probation officer and, as a result, a capias had been issued for his arrest prior to both bank robberies.

In the earlier robbery of the bank on January 19, 1999, Schmitt and another man had stolen over $65,000. Schmitt was armed with a sawed-off shotgun in that robbery. The Commonwealth presented evidence that before the first robbery, police were called to investigate an argument between Schmitt and a girlfriend involving a shotgun, and that Schmitt had

6

"sawed off" the barrel of the gun the night before the first bank robbery.

The Commonwealth also presented evidence of a tape recording of a telephone conversation between Schmitt and a friend in which Schmitt described the present offenses. In addition, the Commonwealth introduced evidence of the "drug dealer lifestyle" that Schmitt had been leading in the months before he committed the present offenses.

The Commonwealth presented testimony from Dunning's family and friends concerning the impact of Dunning's murder on them. Dunning's mother and brother testified that in January 1999, a month before his murder, Dunning had retired from the United States Army after over 20 years of service, and that he had received many commendations honoring his bravery and leadership while in military service. The Commonwealth also presented testimony that Dunning had three children and that he had planned to marry in March 1999. Several bank employees testified that during the few weeks that Dunning worked at the bank, he had developed close relationships with his fellow employees that demonstrated extraordinary thoughtfulness and generosity.

Schmitt presented testimony from the crisis negotiator, Lieutenant Clarcq, that Schmitt had expressed remorse over the killing during the negotiations culminating in his surrender.

7

In addition, Schmitt presented testimony from a medical specialist dealing with adolescent addiction who testified generally concerning the effects of drug addiction and withdrawal. However, this specialist had never treated or evaluated Schmitt. Schmitt also presented testimony from his juvenile probation officer, friends, and family members who described Schmitt as courteous and respectful when he was not under the influence of drugs.

## IV. ISSUES WAIVED OR DEFAULTED

Schmitt raises on appeal the following issues that are procedurally defaulted from consideration in this Court:

1. Schmitt did not ask the trial court to strike prospective juror James J. Goodin for cause based on Goodin's statements concerning the death penalty. Therefore, Schmitt has waived his objection to the seating of this juror. Rule 5:25.[1]

2. Schmitt did not object in the trial court to the exclusion of prospective jurors Linda Miles and Leo Gibbs based on their statements expressing objections to the death penalty. Schmitt also did not argue in the trial court that by excluding

_____

[1]Schmitt asserts that his later motion objecting to the seating of the entire panel was sufficient to preserve this issue. That motion, however, merely referenced "all the reasons stated in our objections to particular jurors," and Schmitt had stated during the voir dire of Goodin that he had no objection to Goodin serving as a juror. Thus, Schmitt's motion was insufficient to preserve for appeal any objection to Goodin serving on the jury.

8

Miles, Gibbs, and others, the court adopted a "pattern of seating pro-death penalty jurors." Because Schmitt failed to make these objections in the trial court, he has waived these issues on appeal. Rule 5:25.

3. Schmitt did not argue in the trial court that the capital murder charge should be struck on the ground that the charge encouraged the jury to impose harsher sentences for the non-capital offenses. Since Schmitt failed to raise this argument in the trial court, he has waived the issue on appeal. Rule 5:25.

4. Schmitt filed a pre-trial motion to bar admission during the penalty phase of the trial of evidence of his unadjudicated conduct. Prior to the trial, the court reserved ruling on the motion. During the penalty phase proceedings, Schmitt did not object to the testimony of several witnesses concerning Schmitt's unadjudicated conduct. Because Schmitt failed to object contemporaneously to the admission of this evidence, Schmitt has waived this objection on appeal. Rule 5:25.

5. Schmitt argues that the trial court erred in allowing the jury to consider the issue of "future dangerousness." In the trial court, Schmitt argued that the "future dangerousness" aggravator is unconstitutionally vague and violates the Sixth, Eighth, and Fourteenth Amendments. However, on brief, he refers

solely to his motion presented to the trial court with regard to this issue. Schmitt's references to arguments that he made in the trial court are insufficient and amount to procedural default of this issue. Burns, 261 Va. at 319, 541 S.E.2d at 881; Hedrick v. Commonwealth, 257 Va. 328, 336, 513 S.E.2d 634, 638, cert. denied, 528 U.S. 952 (1999); Swisher v. Commonwealth, 256 Va. 471, 478, 506 S.E.2d 763, 767 (1998), cert. denied, 528 U.S. 812 (1999).

6. At the conclusion of his brief, Schmitt sets forth an additional argument "relating to all assignments of error" that the alleged errors violated his constitutional rights. However, Schmitt failed to specify in what manner his rights were violated with respect to each assignment of error. Consequently, this argument is waived, and we will not consider it on appeal. See Burns, 261 Va. at 318, 541 S.E.2d at 880; Kasi v. Commonwealth, 256 Va. 407, 413, 508 S.E.2d 57, 60 (1998), cert. denied, 527 U.S. 1038 (1999) (citing Jenkins v. Commonwealth, 244 Va. 445, 451, 423 S.E.2d 360, 364 (1992), cert. denied, 507 U.S. 1036 (1993)).

## V. ISSUE PREVIOUSLY DECIDED

Schmitt raises an argument that we have resolved in a previous decision. Since we find no reason to modify our previously expressed view, we reaffirm our earlier holding and reject the following argument:

10

The trial court erred in admitting "victim impact evidence" because it is not relevant to the jury's sentencing decision in a capital murder case.  Rejected in Weeks v. Commonwealth, 248 Va. 460, 476, 450 S.E.2d 379, 480 (1994), cert. denied, 516 U.S. 829 (1995) (citing Payne v. Tennessee, 501 U.S. 808, 827 (1991)).

## VI.  JURY SELECTION

Schmitt argues that the trial court abused its discretion in refusing to strike certain prospective jurors for cause based on their alleged biases in favor of the death penalty.  Schmitt also contends that the trial court abused its discretion in refusing to strike one prospective juror who formerly was employed as a bank teller.  Finally, Schmitt argues that the court abused its discretion in striking for cause one prospective juror who stated that her objection to the death penalty would prevent her from voting to impose it.  We disagree with Schmitt's arguments.

A prospective juror should be excluded for cause based on the juror's views about the death penalty if those views would substantially impair or prevent the performance of the juror's duties in accordance with his oath and the court's instructions. Barnabei v. Commonwealth, 252 Va. 161, 173, 477 S.E.2d 270, 277 (1996), cert. denied, 520 U.S. 1224 (1997) (citing Wainwright v. Witt, 469 U.S. 412, 424 (1985)).  On appellate review, we give

11

deference to the trial court's determination whether to retain or exclude a prospective juror because the trial court is able to see and hear each member of the venire respond to the questions posed.  Thus, the trial court is in a superior position to determine whether a prospective juror's responses during voir dire indicate that the prospective juror would be prevented or impaired in performing the duties of a juror. Lovitt, 260 Va. at 510, 537 S.E.2d at 875; Vinson v. Commonwealth, 258 Va. 459, 467, 522 S.E.2d 170, 176 (1999), cert. denied, 530 U.S. 1218 (2000).  A trial court's decision regarding the selection or exclusion of jurors will be upheld on appeal unless it is shown that the trial court abused its discretion.  Id.

In conducting our review, we consider a prospective juror's entire voir dire, rather than isolated statements made by the prospective juror.  Id.  In the present case, when prospective juror Darlene W. Temple was asked, "generally speaking," about her views on the death penalty, she responded that she was "in favor" of the death penalty.  When asked whether there was "any particular type of crime in which you think a death penalty would be appropriate," Temple responded, "[P]remeditated, brutal, planned, and [sic] I'm going to kill you kind of murder."  In response to a question whether she could fairly weigh the options of death or life imprisonment even in that

category of cases in which she considered the death penalty to be appropriate, Temple answered in the affirmative.

Similarly, prospective juror William A. Chewning was asked to assume that a defendant had been convicted of capital murder, that the Commonwealth had proved "vileness" or "future dangerousness," or both, and that the jury had "listened to all the evidence[] [in] mitigation and aggravation." When asked whether he would "automatically vote for the death penalty" under these circumstances, Chewning stated, "I think I would, yes." Chewning was then asked to state his understanding of the jury's function after finding a defendant guilty of capital murder. Chewning responded:

> [T]he Commonwealth presents you with evidence[] [whether] they were violent crimes or [whether] he would be able to in the future commit more violence and malice. And if you did find it, then the death penalty should be justified, but if it's not so strong, the evidence, then you might give him a life sentence.

In addition, Chewning responded in the affirmative when asked whether he would be able "to fairly listen to that evidence before deciding whether to give [a defendant] the death penalty or a life sentence."

Prospective juror Mary T. Richardson stated that she previously transferred from a job as a bank teller because she was afraid to work in a bank that had been robbed several times. When asked whether this experience would affect her ability to

13

be an impartial juror, Richardson responded, "I can't say that it will or that it won't," and she later added, "I want to listen to all the facts before I ma[k]e any decision. But knowing that, you know, I've had that fear when I worked at a bank, I might let that sway [me]. I don't know." When asked whether she could "put aside that bias" and base her decision on the evidence in this case and on the law as instructed by the trial court, Richardson responded that she could do so "because the case would not be about me."

The above responses are illustrative of the entire voir dire testimony of these prospective jurors, which contains no indication that the trial court abused its discretion in accepting their statements that they could fulfill the duties of jurors in the trial of the case. The responses of prospective jurors Chewning and Temple indicated that they could consider both the death penalty and life imprisonment in sentencing a defendant for capital murder. Prospective juror Richardson indicated that she could fairly evaluate the evidence, follow the court's instructions, and not be influenced by her experience as a bank teller because the present case was not "about" her. Thus, we conclude that the trial court did not abuse its discretion in refusing to strike these jurors for cause.

14

In contrast, prospective juror Lyn S. Carroll advised the trial court that she had "moral, religious, or conscientious objections to voting for the death penalty," and indicated that she did not think she "could ever vote [for] or consider the death penalty." Carroll also acknowledged that she could not foresee any circumstance under which she "would consider voting for the death penalty." We conclude that the trial court did not abuse its discretion in striking Carroll from the jury panel because her responses demonstrated that her personal objections to the death penalty would have substantially impaired or prevented her from carrying out her duties as a juror. See Vinson, 258 Va. at 467, 522 S.E.2d at 176; Barnabei, 252 Va. at 173, 477 S.E.2d at 277; Yeatts v. Commonwealth, 242 Va. 121, 134-35, 410 S.E.2d 254, 262-63 (1991), cert. denied, 503 U.S. 946 (1992).

Schmitt next argues that the trial court erred in limiting his questioning of prospective jurors during voir dire regarding their views on the death penalty. In support of his argument, Schmitt identifies three portions of the voir dire record in which the trial court limited his attempts to have prospective jurors respond to hypothetical questions concerning the death penalty, and contends that he should have been "allowed latitude in probing the juror's true position."

15

We find no merit in this argument.  In the identified portions of the voir dire examination, Schmitt improperly asked the prospective jurors to speculate regarding whether they would automatically impose a death sentence for certain types of killings or under certain hypothetical circumstances.  These questions were posed without any reference to the prospective jurors' ability to consider the evidence and the court's instructions in deciding whether to impose the death penalty.

In addition, the record demonstrates that the trial court allowed Schmitt considerable latitude in questioning members of the venire concerning their beliefs on the death penalty.  Thus, we conclude that the trial court did not abuse its discretion in restricting Schmitt's questions during voir dire, and that the questioning allowed by the trial court assured the removal of those prospective jurors who would automatically impose the death penalty.  See Clagett v. Commonwealth, 252 Va. 79, 89, 472 S.E.2d 263, 269 (1996), cert. denied, 519 U.S. 1122 (1997); Beavers v. Commonwealth, 245 Va. 268, 277-78, 427 S.E.2d 411, 418, cert. denied, 510 U.S. 859 (1993); Mueller v. Commonwealth, 244 Va. 386, 400-01, 422 S.E.2d 380, 389-90 (1992), cert. denied, 507 U.S. 1043 (1993).

Schmitt next argues that the trial court improperly asked leading questions of prospective jurors during voir dire to "rehabilitate" them and to make them "appear to qualify" for

16

service on the jury, without probing these jurors for their true opinion or bias.  Schmitt contends that the trial court improperly used these responses to its questions to "offset or override" other responses elicited by his counsel.

We do not reach the merits of this argument because Schmitt did not object to any particular question posed by the trial court to any individual member of the venire.  See Rule 5:25.  Instead, he raised only a general objection after 14 potential jurors had been questioned by the parties and the court, and again referred to that general objection at the conclusion of all the voir dire testimony in the case.  These general objections were based on Schmitt's assertion that the trial court acted "inappropriate[ly]" by asking prospective jurors whether they could fairly consider both sentencing alternatives, thereby "hindering [Schmitt's] opportunity to get valid responses."

Such general objections were insufficient to preserve this issue for appeal.  While a party may state an objection to any question posed by a trial judge during voir dire, including an objection that the trial judge improperly has asked a leading question, the objection must be stated in a timely manner with reference to the precise question at issue.  Therefore, a defendant may not assert on appeal that the trial judge has asked improper questions during voir dire unless he first has

17

given the judge a timely opportunity to rule on the merits of such objections and to take any necessary corrective action. See Hodges v. Commonwealth, 213 Va. 316, 317-18, 191 S.E.2d 794, 795 (1972).

## VII.  GUILT PHASE ISSUES

Schmitt argues that the trial court erred in denying his motions to strike the capital murder charge and that the evidence was insufficient as a matter of law to support his conviction on that charge.  Schmitt contends that certain physical evidence supports a reasonable hypothesis that the shooting occurred during a struggle and was unintentional, thereby negating the element of premeditation.  Schmitt relies on the evidence of powder residue on Dunning's jacket, the location of the bullet hole in the jacket, as well as the evidence of blood on Schmitt's left hand and the location of the bullet casings "to the left of where the defendant would have been."  We disagree with Schmitt's arguments.

The issue of premeditation is a question to be resolved by the finder of fact.  Bailey v. Commonwealth, 259 Va. 723, 749, 529 S.E.2d 570, 585, cert. denied, ___ U.S. ___, 121 S.Ct. 488 (2000); Weeks, 248 Va. at 477, 450 S.E.2d at 390; Clozza v. Commonwealth, 228 Va. 124, 134, 321 S.E.2d 273, 279 (1984), cert. denied, 469 U.S. 1230 (1985).  The intent to kill need not exist for any specific period of time before the actual killing.

18

Id. To establish the element of premeditation, the Commonwealth need only show that the intent to kill existed for a moment before the fatal act was committed. Id.

The evidence showed that Schmitt entered the bank armed with a loaded and concealed weapon. After Dunning came inside the bank and stood near the end of the teller line, Schmitt left his place in that line and walked directly to the location where Dunning was standing. Without saying anything, Schmitt fired two shots, one of which hit Dunning in the chest. After the shooting, Schmitt shouted, "get down," and threatened to "kill everybody" if he did not get some money.

We conclude that this evidence was sufficient to establish the element of premeditation. Viewed in the light most favorable to the Commonwealth, the evidence supported a conclusion that Schmitt intended to kill Dunning from the moment that Schmitt left his place in the teller line and began to approach Dunning. At this point, he possessed a concealed, loaded weapon, which he used to shoot Dunning at close range within seconds of departing from his place in the teller line.

Schmitt's contrary argument relies largely on speculation, rather than on reasonable inferences that can be drawn from the evidence. Moreover, the jury was entitled to reject his view of the evidence and conclude that he acted with premeditation when he fired the shot that killed Dunning. Therefore, we conclude

19

that the evidence was sufficient to support the jury's determination of guilt on the capital murder charge.

Schmitt argues that the trial court erred in refusing to permit the crisis negotiator, Lieutenant Clarcq, to testify regarding statements Schmitt made to Clarcq about the robbery and shooting.  These statements included Schmitt's admission that he robbed the bank and a statement that he did not intend to kill Dunning but shot him during a struggle.  Schmitt contends that these statements were admissible as a declaration against his penal interest.  We disagree.

Schmitt's statements to Clarcq do not qualify as declarations against his penal interest.  This exception to the hearsay rule allows out-of-court statements that tend to incriminate a declarant to be received in evidence upon a showing that the declaration is reliable and that the declarant is presently unavailable.  Ellison v. Commonwealth, 219 Va. 404, 408, 247 S.E.2d 685, 688 (1978).  Underlying this exception is the presumption that individuals have a strong interest in protecting themselves and thus do not often make statements that expose themselves to criminal liability unless those statements are true.  See Newberry v. Commonwealth, 191 Va. 445, 461, 61 S.E.2d 318, 326 (1950); Hines v. Commonwealth, 136 Va. 728, 743-44, 117 S.E. 843, 847 (1923).  When the declarant has made an incriminating statement that is contrary to his self-interest,

20

this "element of self-interest" functions as "a reasonably safe substitute for the oath and cross-examination as a guarantee of truth." Newberry, 191 Va. at 461, 61 S.E.2d at 326 (citing Hines, 136 Va. at 744, 117 S.E. at 847).

Here, however, the chief portion of the statement that Schmitt sought to have admitted was a self-serving denial of his criminal intent on the capital murder charge.[2] Schmitt's statement that he shot Dunning during a struggle is not contrary to Schmitt's self-interest but instead promotes the goal of protecting himself from criminal liability for capital murder. For this reason, as a threshold matter, the statement is not a declaration against penal interest.[3] Accordingly, we conclude that the trial court did not err in refusing Schmitt's request to admit evidence of these statements made to Lieutenant Clarcq.

Schmitt argues that the trial court erred in refusing his tendered jury instruction concerning the Commonwealth's alleged failure to produce as witnesses two bank customers who were shown in a bank camera photograph standing behind Schmitt in the

_____

[2]Schmitt cannot plausibly argue that he was prejudiced by the trial court's refusal to admit that portion of his statement to Clarcq that admitted his culpability in the robberies. Moreover, this portion of his statement to Clarcq was cumulative evidence of his guilt on the robbery charges. See Harrison v. Commonwealth, 244 Va. 576, 585, 423 S.E.2d 160, 165 (1992).

[3]Based on our disposition of this assignment of error, we need not address whether Schmitt's declaration was reliable or whether his decision not to testify made him "unavailable" for purposes of the hearsay exception on which he relies.

21

teller line.  The refused instruction stated that the Commonwealth's "unexplained" failure to produce these witnesses raised a presumption that their testimony would be unfavorable to the Commonwealth.

We find no merit in this argument.  The granting of such an instruction in a criminal case is improper.  Russell v. Commonwealth, 216 Va. 833, 836-37, 223 S.E.2d 877, 879 (1976). The rationale underlying this rule is plain.  The Commonwealth's burden of proof does not include the duty to produce all witnesses possibly having some knowledge of a case, and a criminal defendant need not prove anything or call any witnesses in his defense.  Id.; see Wise v. Commonwealth, 230 Va. 322, 330, 337 S.E.2d 715, 721 (1985), cert. denied, 475 U.S. 1112 (1986); Robinson v. Commonwealth, 207 Va. 66, 69, 147 S.E.2d 730, 732 (1966).  Thus, the trial court properly refused the instruction at issue.

Schmitt argues that the trial court erred in instructing the jury that "[i]t is permissible to infer that every person intends the natural and probable consequences of his or her acts."  Schmitt contends that this instruction effectively created an improper presumption that "negated or diminished the effect of the presumption of innocence."  We disagree with Schmitt's argument.

This instruction did not establish an improper presumption but merely stated a permissive inference. Kelly v. Commonwealth, 8 Va. App. 359, 374, 382 S.E.2d 270, 278 (1989). Unlike conclusive or burden shifting presumptions regarding a defendant's criminal intent, which are constitutionally invalid, the present instruction did not require the jurors to draw any inference or alter the Commonwealth's burden of proving Schmitt's criminal intent beyond a reasonable doubt. Id.; see Connecticut v. Johnson, 460 U.S. 73, 84 (1983); Sandstrom v. Montana, 442 U.S. 510, 521 (1979).

## VIII. SENTENCING PHASE ISSUES

Schmitt argues that the admission into evidence of the tape recording of the telephone conversation between him and his friend, Clifford Sauer, violated his Fifth and Sixth Amendment rights because Sauer acted as a "police agent" during the conversation. In response, the Commonwealth asserts that Schmitt's failure to comply with the notice requirements of Code § 19.2-266.2 in the trial court bars consideration of this issue on appeal. We agree with the Commonwealth.

Code § 19.2-266.2 requires that, in the absence of good cause shown and in the interests of justice, all motions seeking suppression of evidence based on an alleged violation of the Fourth, Fifth, or Sixth Amendments be made in writing, not later than seven days before trial. Schmitt does not dispute that he

failed to comply with these statutory requirements, and he does not argue on appeal that he satisfied the good cause exception provided in the statute.  Since Schmitt has failed to meet these statutory requirements, he has waived on appeal his argument regarding the admissibility of the tape recording.  See Upchurch v. Commonwealth, 31 Va. App. 48, 51, 521 S.E.2d 290, 291-92 (1999).

Schmitt argues that the trial court erred in refusing to admit evidence concerning prison life and the security features of a "maximum security" prison in the Commonwealth to rebut the Commonwealth's contention of Schmitt's future dangerousness.  He asserts that in a capital murder sentencing, such evidence is relevant to the issue whether a defendant will pose a future threat to society.

We conclude that Schmitt's argument has no merit, given the sentencing phase evidence presented by the Commonwealth.  In that portion of the trial, the Commonwealth did not present evidence concerning prison security or the nature of prison confinement imposed on a defendant who has been convicted of a capital murder offense.  Therefore, Schmitt's proffered evidence was not admissible to rebut any particular evidence concerning prison security or prison conditions offered by the Commonwealth.

In addition, Schmitt's proffered evidence was inadmissible to rebut the Commonwealth's contention that he would commit future acts of violence.  As we explained in Burns:

> [T]he relevant inquiry is not whether [the defendant] could commit criminal acts of violence in the future but whether he would. . . . In other words, a determination of future dangerousness revolves around an individual defendant and a specific crime. Evidence regarding the general nature of prison life in a maximum security facility is not relevant to that inquiry, even when offered in rebuttal to evidence of future dangerousness such as that presented in this case.

261 Va. at 339-40, 541 S.E.2d at 893.

Schmitt also argues that the trial court erred in refusing three supplemental jury instructions, each of which advised the jury that a life sentence would be imposed if the jury could not unanimously agree on a penalty.  Schmitt asserts that these instructions were tendered after "the jury's deliberations became extended," and contends that the instructions were correct statements of the law and should have been given at that stage of the jury's deliberations.  We disagree with Schmitt's arguments.

The trial court properly refused the proffered instructions.  As we have explained in earlier decisions, such instructions concern a procedural matter that is not an appropriate subject for a jury instruction.  Spencer v. Commonwealth, 238 Va. 295, 318, 384 S.E.2d 785, 799 (1989),

25

cert. denied, 493 U.S. 1093 (1990) (quoting Justus v. Commonwealth, 220 Va. 971, 979, 266 S.E.2d 87, 92 (1980), cert. denied, 455 U.S. 983 (1982)); see also Pruett v. Commonwealth, 232 Va. 266, 279 n.6, 351 S.E.2d 1, 9 n.6 (1986), cert. denied, 482 U.S. 931 (1987).  Instructions of this nature also constitute an open invitation for the jury to avoid its responsibility and to disagree on the sentence that a capital murder defendant should receive.  Id.; see also Eaton v. Commonwealth, 240 Va. 236, 257, 397 S.E.2d 385, 398 (1990), cert. denied, 502 U.S. 824 (1991).

Schmitt next argues that the trial court erred in refusing to grant a mistrial or to give curative instructions to the jury based on allegedly inflammatory comments made by the prosecutor in his closing argument.  The prosecutor's comments at issue concerned: (1) Schmitt's use of a stolen gun when the Commonwealth earlier had stipulated that the gun was not stolen; (2) Schmitt's prior "shotgun assault" on his girlfriend; and (3) the "wonderful life" in prison Schmitt would have were he sentenced to life imprisonment.  Schmitt asserts that the trial court's failure to take corrective action in this regard denied him a fair trial and violated his due process rights.  We disagree with Schmitt's arguments.

The record shows that after Schmitt objected to the Commonwealth's improper reference to his use of a stolen gun,

the Commonwealth acknowledged its mistake and the trial court granted a curative instruction.  The court told the jury that the parties had stipulated that "[t]he weapon was not stolen, but [that Schmitt] was a convicted felon when he came into possession of it."  When the prosecutor then stated to the jury that "your recollection of the evidence is what counts in this case," Schmitt again objected, contending that this argument effectively suggested that the jury could ignore the trial court's curative instruction.  In response to this objection, the trial court stated again that there was no evidence that the gun had been stolen.

We will presume that a jury has followed the trial court's prompt and explicit curative instructions, unless the record clearly shows that the jury disregarded the instructions. Beavers, 245 Va. at 280, 427 S.E.2d at 420; Spencer v. Commonwealth, 240 Va. 78, 95, 393 S.E.2d 609, 619, cert. denied, 498 U.S. 908 (1990).  Here, the trial court promptly gave explicit curative instructions after Schmitt timely objected to the prosecutor's remarks, and the record does not show that the jury disregarded the curative instructions.  It is well established that a judgment will not be reversed for a statement of counsel that the court promptly directs the jury to disregard unless there is a manifest probability that the improper comments were prejudicial to the defendant.  Kitze v.

Commonwealth, 246 Va. 283, 288, 435 S.E.2d 583, 585 (1993) (citing Saunders v. Commonwealth, 218 Va. 294, 303, 237 S.E.2d 150, 156 (1977)).  We hold that the record fails to show a manifest probability of prejudice, and we conclude that the trial court did not abuse its discretion in its response to the objections raised and in denying Schmitt's motion for a mistrial related to those objections.

We do not reach the merits of Schmitt's arguments concerning the trial court's failure to give a curative instruction or to grant a mistrial regarding the prosecutor's comment on Schmitt's prior "shotgun assault" on his girlfriend, and on the "wonderful life" that he would experience in prison. Schmitt did not make a request for a curative instruction or a mistrial at the time either of these remarks were made, but waited until after the jury had retired to place the issues before the trial court in the form of a motion for a mistrial. Unless a defendant has made a timely motion for a cautionary instruction or for a mistrial, we will not consider his assignments of error alleging that improper remarks were made by the prosecutor.  Sheppard v. Commonwealth, 250 Va. 379, 394-95, 464 S.E.2d 131, 140-41 (1995), cert. denied, 517 U.S. 1110 (1996); Breard v. Commonwealth, 248 Va. 68, 82, 445 S.E.2d 670, 679, cert. denied, 513 U.S. 971 (1994); Cheng v. Commonwealth, 240 Va. 26, 38, 393 S.E.2d 599, 605-06 (1990).  A motion for a

mistrial is untimely and is properly refused when it is made after the jury has retired from the courtroom. Breard, 248 Va. at 82, 445 S.E.2d at 679; Cheng, 240 Va. at 39, 393 S.E.2d at 606.

Schmitt also asserts that the trial court erred in "allowing" the prosecutor to argue, in support of a death sentence, that the jury should not "trust the system that can be so easily manipulated by the defendant." However, we do not reach the merits of this argument because Schmitt failed to object to the argument at the time it was made. Rule 5:25. Also, since Schmitt did not request a mistrial based on this remark, we do not consider his argument that the trial court erred in failing to grant a mistrial on this ground. Rule 5:25.

Schmitt next argues that the trial court erred in allowing the Commonwealth to present evidence regarding the "vileness" statutory aggravator, and in allowing the jury to consider this factor. Schmitt contends that the evidence of "vileness" was insufficient as a matter of law, and that although the jury did not render its sentence of death based on the "vileness" predicate, the arguments concerning "vileness" were prejudicial to the jury's consideration of his "future dangerousness." We disagree with Schmitt's arguments.

A finding of "future dangerousness" rests upon different considerations than a finding of "vileness." We will presume

29

that a jury has followed the trial court's instructions setting forth the separate considerations for determining each aggravating factor unless the record clearly shows that the jury disregarded these instructions. See Beavers, 245 Va. at 280, 427 S.E.2d at 420; Spencer, 240 Va. at 95, 393 S.E.2d at 619.

Here, the jury rejected a finding of "vileness" and based Schmitt's sentence of death solely on the "future dangerousness" predicate. Schmitt has pointed to nothing in the record suggesting that the jury failed to follow the trial court's instructions, and the jury's rejection of the "vileness" predicate indicates that it considered this aggravating factor separately as the law requires.

We next consider Schmitt's argument that the evidence is insufficient to support the jury's finding of "future dangerousness." Schmitt contends that neither his prior criminal record nor that record combined with evidence of his unadjudicated conduct was sufficient to support such a finding. He asserts that this fact "is particularly true" given that his "society" for the rest of his life would be a "close custody" prison. We disagree with Schmitt's arguments.

Under Code § 19.2-264.2, the death penalty may not be imposed unless the trier of fact finds one or both of the two aggravating factors that we have referred to as "vileness" and "future dangerousness." Lovitt, 260 Va. at 516, 537 S.E.2d at

30

878; Roach v. Commonwealth, 251 Va. 324, 347, 468 S.E.2d 98, 111-12, cert. denied, 519 U.S. 951 (1996). In the present case, the jury found "future dangerousness," meaning "there is a probability that [Schmitt] would commit criminal acts of violence that would constitute a continuing serious threat to society." Code § 19.2-264.2.

We have held that the facts and circumstances surrounding a capital murder may be sufficient, standing alone, to support a finding of "future dangerousness." See Lovitt, 260 Va. at 516, 537 S.E.2d at 878; Roach, 251 Va. at 348, 468 S.E.2d. at 112; Murphy v. Commonwealth, 246 Va. 136, 145, 431 S.E.2d 48, 53, cert. denied, 510 U.S. 928 (1993). Here, Schmitt murdered Dunning, an innocent security guard, to facilitate a robbery and to avoid being apprehended at the robbery scene. The jury was entitled to find that this violent, premeditated action was strong evidence that Schmitt is a dangerous person who would commit future criminal acts of violence.

The jury also was entitled to consider Schmitt's criminal record. As we have stated, this record includes two convictions of possession of marijuana with the intent to distribute, possession of a firearm by a convicted felon, and receiving stolen property. After being released from confinement in 1997, Schmitt was placed on probation. Based on his failure to comply with drug testing requirements and to report to his probation

31

officer, Schmitt was charged with violating his probation and failed to appear in court to answer those charges. Further, during the time leading up to the present offenses, Schmitt had been "working" as a drug dealer.

Significantly, the jury also was allowed to consider the fact that Schmitt had committed another armed robbery less than one month prior to the present offense. This evidence, in addition to evidence of the present crimes, demonstrated that Schmitt did not refrain from violent criminal behavior, even after having experienced incarceration and having received the benefit of probation supervision.

We find no merit in Schmitt's argument that the evidence of his "future dangerousness" was insufficient because his "society," after receiving a sentence of life imprisonment for capital murder, would have been a "close custody" prison. Code § 19.2-264 does not limit the jury's consideration to a type of "prison society," and we will not rewrite the statute to restrict its scope in that manner. Lovitt, 260 Va. at 517, 537 S.E.2d at 879. Therefore, we conclude that the evidence of the present offenses and of Schmitt's prior criminal behavior is sufficient to support the jury's finding of "future dangerousness."

We next consider Schmitt's argument that the trial court erred in refusing to instruct the jury on certain "facts" in

alleged mitigation of the present offenses. Those "facts" included a statement that the capital murder was committed while Schmitt was under the influence of controlled substances, that Schmitt had shown remorse for his actions, and that a term of life imprisonment would be served without parole.

We conclude that the trial court properly refused Schmitt's proposed instruction. Since the trial court separately instructed the jury that imprisonment for life in this case excluded the possibility of parole, the portion of the disputed instruction that also contained this information was repetitious. See Burns, 261 Va. at 343, 541 S.E.2d at 895; Gray v. Commonwealth, 233 Va. 313, 351, 356 S.E.2d 157, 178, cert. denied, 484 U.S. 873 (1987). The remainder of the disputed instruction was properly refused because a defendant who has been convicted of capital murder is not entitled to a jury instruction that emphasizes any particular mitigating factors. Burns, 261 Va. at 343, 541 S.E.2d at 895; George v. Commonwealth, 242 Va. 264, 283, 411 S.E.2d 12, 23 (1991), cert. denied, 503 U.S. 973 (1992).

X.  SENTENCE REVIEW

### Passion and Prejudice

Under Code § 17.1-313(C), we review the death sentence imposed on Schmitt to determine whether it (1) was imposed under the influence of passion, prejudice, or any other arbitrary

33

factor; or (2) is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Schmitt argues that the sentence was based on passion, prejudice, and arbitrariness because the Commonwealth improperly was permitted to argue that Schmitt's crime satisfied the "vileness" aggravating factor in the absence of a sound legal basis for making that argument. Schmitt also asserts that no evidence was presented of any prior violent conduct on his part that resulted in harm to any person, or of him having caused "the slightest difficulty" during his previous incarcerations.

In addition, Schmitt contends that the jurors' passions were improperly inflamed by evidence of his tape-recorded conversation with Clifford Sauer and by the testimony of Dunning's family. Schmitt also argues that the prosecutor engaged in an intentional effort during closing argument to raise the jurors' passions by making improper comments to encourage them to vote for the death penalty. We find no merit in Schmitt's arguments.

First, the jury's rejection of the "vileness" aggravator demonstrates that the death sentence was not affected by the prosecutor's argument regarding "vileness." In addition, the jury fixed sentences of 35 years each on the two charges of robbery when it could have sentenced Schmitt to life

34

imprisonment for each charge. These sentencing decisions show that the argument and evidence concerning the "vileness" aggravator did not inflame the passions of the jury.

Second, since the "victim impact" testimony and Schmitt's own tape-recorded conversation were properly received as evidence in the penalty phase of the trial, the jury was entitled to consider this evidence in making its sentencing determination. Likewise, Schmitt's criminal record and his conduct during prior periods of incarceration were also evidence properly presented to the jury, which was permitted to accord that evidence whatever weight it deemed proper.

We also conclude that the record fails to demonstrate that the prosecutor's comments during closing argument resulted in a death sentence that was imposed under the influence of passion, prejudice, or any other arbitrary factor. Moreover, based on our independent review of the record, we find no evidence that any such impermissible factor was present or influenced the jury's sentence.

<u>Excessiveness and Proportionality</u>

Schmitt argues that his sentence is excessive and disproportionate to the penalty imposed in similar cases. He asserts that only one capital murder defendant in Virginia, the defendant in <u>Roach</u>, received the death penalty for a murder that resulted from a single gunshot wound in the absence of torture

35

or other aggravating factor.  Schmitt thus contends that juries have not _generally_ imposed the death penalty for crimes similar to Schmitt's, but instead generally impose life imprisonment for such offenses.

In conducting our proportionality review, we do not isolate our consideration to any particular prior case, but must determine whether "other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant."  _Lovitt_, 260 Va. at 518, 537 S.E.2d at 880; _Johnson v. Commonwealth_, 259 Va. 654, 683, 529 S.E.2d 769, 786, _cert. denied_, ___ U.S. ___, 121 S.Ct. 432 (2000) (quoting _Jenkins_, 244 Va. at 461, 423 S.E.2d at 371).  Thus, we reject Schmitt's invitation to focus solely on the method in which the murder was accomplished in this case, because to do so would ignore our statutory mandate to conduct our review with full consideration of both the crime and the defendant.  _See_ Code § 17.1-313(C)(2).

We have compared the record in the present case with the records of other capital murder cases, including those in which a sentence of life imprisonment was imposed.  We also have examined the records of all capital cases reviewed by this Court pursuant to Code § 17.1-313(E).  Since the jury imposed the death sentence based on the "future dangerousness" predicate, we

give particular consideration to other capital murder cases in which the death penalty was obtained under that predicate.

We observe that juries in this Commonwealth, with some exceptions, generally have imposed the death sentence for convictions of capital murder based on a finding of "future dangerousness" in which the underlying qualifying crime was robbery.  See, e.g., Lovitt, 260 Va. 497, 537 S.E.2d 866; Orbe v. Commonwealth, 258 Va. 390, 519 S.E.2d 808 (1999), cert. denied, 529 U.S. 1113 (2000); Roach, 251 Va. 324, 468 S.E.2d 98; Chandler v. Commonwealth, 249 Va. 270, 455 S.E.2d 219, cert. denied, 516 U.S. 889 (1995); Joseph v. Commonwealth, 249 Va. 78, 452 S.E.2d 862, cert. denied, 516 U.S. 876 (1995); Swann, 247 Va. 222, 441 S.E.2d 195; Chichester v. Commonwealth, 248 Va. 311, 448 S.E.2d 638 (1994), cert. denied, 513 U.S. 1166 (1995); Dubois v. Commonwealth, 246 Va. 260, 435 S.E.2d 636 (1993), cert. denied, 511 U.S. 1012 (1994); Yeatts, 242 Va. 121, 410 S.E.2d 254; Savino v. Commonwealth, 239 Va. 534, 391 S.E.2d 276, cert. denied, 498 U.S. 882 (1990); Mackall v. Commonwealth, 236 Va. 240, 372 S.E.2d 759 (1988), cert. denied, 492 U.S. 925 (1989); Townes v. Commonwealth, 234 Va. 307, 362 S.E.2d 650 (1987), cert. denied, 485 U.S. 971 (1988).  Based on this review, we hold that Schmitt's death sentence is neither excessive nor disproportionate to penalties imposed by other

37

sentencing bodies in the Commonwealth for comparable crimes, considering both the crime and the defendant.

## IX.   CONCLUSION

We find no reversible error in the judgments of the trial court.  Having reviewed Schmitt's death sentence pursuant to Code § 17.1-313, we decline to commute the sentence of death. Accordingly, we will affirm the trial court's judgments.

Record No. 003010 — Affirmed.
Record No. 010007 — Affirmed.
