COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton, Judges Elder and McClanahan
Argued at Alexandria, Virginia


JOSEPH DONALD OLIVER
                                              MEMORANDUM OPINION[*] BY
v.        Record No. 1237-07-4            JUDGE ELIZABETH A. McCLANAHAN
                                                  JUNE 30, 2009
COMMONWEALTH OF VIRGINIA


                    FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                              Gaylord L. Finch, Judge

            W. Michael Chick, Jr. (Office of the Public Defender, on brief), for
            appellant.

            Eugene Murphy, Senior Assistant Attorney General (Robert F.
            McDonnell, Attorney General, on brief), for appellee.


        A jury convicted Joseph Donald Oliver of two counts of attempted capital murder in

violation of Code §§ 18.2-25 and 18.2-31(6), two counts of use of a firearm in the commission of

a felony in violation of Code § 18.2-53.1, and possession of a firearm as a convicted felon in

violation of Code § 18.2-308.2.  Appellant argues on appeal that the trial court erred in denying

his motion to suppress his inculpatory statements to the police because (i) his condition rendered

his Miranda[1] waiver involuntary in the first instance, and (ii) he was interrogated without having

been "properly Mirandized" in the second instance.  Appellant also argues that the court erred in

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

excluding the testimony of a psychologist regarding the reliability of his statements to the police.[2] For the following reasons, we affirm appellant's convictions.

## I. Background

We review the evidence in the "light most favorable" to the Commonwealth as the prevailing party below. Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003) (citations omitted). On October 11, 2005, appellant's family reported him missing and possibly suicidal. On October 29, 2005, appellant's family drove by his apartment and saw his car parked outside. While his family was on the phone with police, appellant walked out of the apartment building. Appellant's family approached him and convinced him to accompany them to Richmond.

Appellant indicated he needed some items out of his apartment, and his brother-in-law, Darden Hutson, escorted him back into the apartment building. Hutson asked appellant if he had any firearms. Appellant replied that he had two guns, one in his pants pocket and another in a camera case. Hutson told appellant he could not bring the weapons with him, but appellant insisted he needed them.

Shortly after appellant and Hutson returned to the car, police arrived on the scene. Hutson's wife, Betty, approached the officers and explained that her brother was armed. Meanwhile, appellant's family continued to try to convince him to relinquish his weapons.

When police approached appellant, he backed away from the parking lot and put one hand on his camera case and the other in his pants pocket. Officer Huminik asked appellant if he had any weapons, and appellant responded affirmatively, producing both guns. Officer Huminik

---

[2] Judge Kathleen H. MacKay presided over the suppression hearing. Judge Gaylord L. Finch presided over the trial and entered the final conviction and sentencing orders.

instructed appellant to put the guns down. Appellant returned the guns to his pocket and a bag he was carrying.

Officer Feigleson was concerned appellant was suicidal and conversed with him for nearly an hour in an attempt to save his life. As darkness approached and the weather grew colder, appellant grew less responsive to Officer Feigleson's questions and began moving his hands across his guns more frequently. Officer Feigleson believed appellant "was warming up to make a decision" and that he "was going to drive us to shoot him directly." The officers decided to disarm appellant with beanbag ammunition and taser darts.

When the officers fired their stunning weapons, appellant responded by "shooting away with both arms, both guns in both directions . . . ," and expending all eleven shots available in his two weapons. In the process, appellant pointed one of his guns at and shot Officers Feigleson and McCaskill, who were standing together, within a few feet from appellant. One bullet wounded Officer Feigleson in the leg while another passed through Officer McCaskill's hair. Appellant also shot at, but did not hit, two other officers. Police shot appellant twice in the chest.

As appellant was being treated in the ambulance, he asked the medic if the officers were "ok," and stated, "I only wanted to hurt myself. I was hit by something and then I started shooting."

Appellant's October 30, 2005 Statements to Detective Wallace

On October 30, 2005, the day after the shooting, Detective Wallace visited appellant in the hospital. Detective Wallace told appellant he wanted to "talk to him about what had happened . . . the day before." Appellant responded he "was confused about it at first, but . . . since a day ha[d] passed, he remember[ed] better." Detective Wallace asked appellant background questions about his education and job history, and upon receiving appropriate responses, provided him with a written <u>Miranda</u> warning and consent form.

Appellant indicated he could read and write, understood the form, and signed it. After he was advised of his <u>Miranda</u> rights, appellant asked Detective Wallace "how long this would take if he wanted a lawyer." Detective Wallace responded that he would cease talking to appellant if he wanted a lawyer. Then, as Detective Wallace testified,

> I . . . had him specify, do you want an attorney or do you want to talk, and actually, I said it several times, and then he asked what type of questions I was going to ask him, and I again said I just want to go over what happened the day before, and we'll go from there.

In response, appellant "agreed to talk."

Appellant told Detective Wallace his weapons were concealed when the police arrived at the scene, but when the officers asked to see his hands, he produced two handguns. At that time, appellant moved to the front of his apartment building, sat down, and began talking with Officer Feigleson. The officers and appellant reached a "stand-off" because appellant wanted to go back into his apartment, and the officers refused.

Appellant then recalled "something going by his cheek and then . . . being hit in the chest." The guns were in his lap, and appellant "leaned to the right . . . pull[ed] up and pull[ed] the trigger . . . ." Appellant remembered hearing "loud popping noises," followed by the sensation of pain in his back. Detective Wallace testified as follows:

> Q: Did he indicate . . . who he had shot?
>
> A: He indicated that the officer that he was speaking with during the negotiations would be the officer that he would have shot because that's the direction he had pointed towards.
>
>     *      *      *      *      *      *      *
>
> Q: Did the [d]efendant indicate how many times he shot his weapon?
>
> A: He remembers pulling the trigger over and over and when he was telling me that he's actually demonstrating with his hand pulling the trigger.

- 4 -

<u>Appellant's November 23, 2005 Statements to Deputy Ruff</u>

On November 23, 2005, Deputy Ruff was posted as a guard outside appellant's hospital room. Deputy Ruff spoke with appellant and asked if the bullets had been removed from his chest. Appellant replied that they been removed, but some fragments remained. Deputy Ruff told him he was "very lucky."

No further conversation took place for approximately "a minute." Appellant then asked Deputy Ruff what caliber round the officers had used, and Deputy Ruff answered, "Nine millimeter." Appellant expressed surprise that the officers did not use a smaller round and stated he had "Black Talons [in his guns] that night." Deputy Ruff replied, "Oh, really?," and appellant went on to state that he had a Smith and Wesson Model 27 with Black Talons and a Model 60 with .38's on the day of the shooting. He said the .38's were low power, and he was surprised at the damage that they did.

Another pause followed before appellant stated, "I'm surprised that the taser isn't as strong as I thought it was." Deputy Ruff responded, "Why do you say that?" Appellant answered, "Because I was tasered four times that night and I still had enough strength at the end to aim my weapon at the officer that was talking to me."

Appellant was charged with two counts of attempted capital murder in violation of Code §§ 18.2-25 and 18.2-31(6), two counts of use of a firearm in the commission of a felony in violation of Code § 18.2-53.1, and possession of a firearm as a convicted felon in violation of Code § 18.2-308.2.

In his suppression motion, appellant sought to exclude his inculpatory statements to both Detective Wallace and Deputy Ruff. As to the statements to Detective Wallace, appellant contended that, given his medical condition the day after the shooting, he was not "in any type of condition to be able to waive his <u>Miranda</u> rights" when Detective Wallace advised him of those

rights at that time. The trial court rejected this argument, finding from the evidence presented that appellant was neither "confused in his mental state" nor "suffering some physical effects" such as to render his waiver of the Miranda rights involuntary. The court further found that appellant's "confession" to Detective Wallace was "detailed, lucid, and there was no evidence that he was in distress."

As to appellant's later statements to Deputy Ruff, appellant argued that the deputy interrogated him without advising him of his Miranda rights. Rejecting this argument, the trial court found that Detective Wallace had already advised appellant of those rights and that, alternatively, "the deputy's actions in this case did not constitute an intentional interrogation." Deputy Ruff, the court explained, "was asking a simple question about the [d]efendant's health, and . . . everything else came out of that, . . . even . . . the conversation about the taser was initiated by the [d]efendant . . . ." The court therefore denied appellant's suppression motion.

At trial, appellant sought to introduce the testimony of a psychiatrist, Dr. Michael Hendricks, regarding the reliability of appellant's statements to Detective Wallace and Deputy Ruff. Based on appellant's proffer of Dr. Hendricks' testimony, the trial court ruled that the proposed testimony was inadmissible.

This appeal followed appellant's conviction on each of the five charges against him.

## II. Analysis

### A. Denial of Motion to Suppress

"In reviewing a trial court's denial of a motion to suppress, 'the burden is upon [the defendant] to show that the ruling, when the evidence is considered most favorably to the Commonwealth, constituted reversible error.'" McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (*en banc*) (citation omitted). Further, while we are bound to "review *de novo* the trial court's application of defined legal standards to the particular facts of a

case," we review its "findings of historical fact only for clear error." Ferguson v. Commonwealth, 52 Va. App. 324, 334, 663 S.E.2d 505, 510 (2008) (citations omitted), aff'd, ___ Va. ___, ___ S.E.2d ___ (June 4, 2009) (No. 081645).

Appellant argues that his motion to suppress his statements to Detective Wallace was erroneously denied because the statements, as well as the Miranda waiver he executed, were not voluntary. He also argues his statements to Deputy Ruff should have been suppressed because he was not "Mirandized" prior to questioning.

In support of the argument that his statements and written waiver given to Detective Wallace were involuntary, appellant asserts that he had been shot the previous day, was recovering from surgery, and was receiving pain medication and oxygen. He further notes that he indicated to Detective Wallace he was "confused" as to the circumstances surrounding the shooting.

"Whether a statement is voluntary is ultimately a legal rather than a factual question, but subsidiary factual questions are entitled to a presumption of correctness." Venable v. Commonwealth, 12 Va. App. 358, 359, 404 S.E.2d 74, 75 (1991). "[F]ollowing a trial court's finding of voluntariness, the scope of our appellate review is limited to determining whether the evidence supports the finding." Id. at 359-60, 404 S.E.2d at 75. "Thus, the findings by the trial judge, unless plainly wrong or without evidence to support them, will not be overturned on appeal." Id. at 360, 404 S.E.2d at 75.

Detective Wallace testified that he spoke with appellant's doctor prior to interviewing appellant in the intensive care unit, and was allowed to question appellant. Detective Wallace asked appellant what medications he was taking, and appellant told him he was on a "painkiller," but could not identify it by name. Appellant indicated he had taken his last dose approximately twenty minutes earlier.

Appellant told Detective Wallace he had worked for Toyota for fifteen years, but was currently unemployed. Detective Wallace knew this information to be accurate because, in searching appellant's home, he had observed certificates relating to his employment with Toyota.

Detective Wallace asked appellant about his educational background, and appellant stated he had attended the University of Richmond for two years, but had left after being arrested for arson and propelling a missile into an automobile. Detective Wallace later verified the accuracy of this statement by obtaining a certified copy of appellant's conviction.

Detective Wallace noted that appellant seemed to have no trouble understanding his questions and answered them appropriately. Upon determining that appellant could read and write and understood his Miranda rights, Detective Wallace presented him with a written waiver form. Detective Wallace explained the significance of appellant initialing the waiver of each right, and appellant stated "he understood each right." Appellant then asked Detective Wallace "how long this would take if he wanted a lawyer," and Detective Wallace responded that he would not interview him if he wanted a lawyer. Detective Wallace testified as follows:

> I then had him specify, do you want an attorney or do you want to talk, and actually, I said it several times, and then he asked me what type of questions I was going to ask him, and I again said I just want to go over what happened the day before, and we'll go from there.

Appellant agreed to talk with Detective Wallace and gave a detailed statement that lasted approximately an hour and a half. Appellant identified the types of guns he was holding in each hand and noted that he had concealed them until the officers asked to see his hands. He also told Detective Wallace the guns were loaded with Black Talons and Nyclad bullets. Detective Wallace knew that Black Talon ammunition had been recovered from appellant's apartment.

Appellant told Detective Wallace that he came to a "stand-off" with police when the officers refused to allow him to enter his apartment. Appellant never indicated to Detective

Wallace that he did not understand "what was going on," although he did describe the events surrounding the shooting as "confusing."

Based on this record, the trial court's finding that appellant's waiver and statements were voluntary was not plainly wrong nor without evidence to support it. Detective Wallace consulted with appellant's doctor prior to interviewing him, and was allowed to question appellant for more than an hour. Appellant provided Detective Wallace with specific, accurate information about his work and educational history, and his description of the events surrounding the shooting was consistent with the physical evidence and statements of other witnesses. Appellant inquired about his right to an attorney and elected to proceed after Detective Wallace informed him the interview would terminate upon appellant's request for counsel. Accordingly, the motion to suppress appellant's statements to Detective Wallace was properly denied.

We now turn to appellant's argument that his statement to Deputy Ruff should have been suppressed because it was not preceded by Miranda warnings "reasonably contemporaneous with the questioning." Assuming, without deciding, that Deputy Ruff's conversation with appellant constituted an "interrogation" for purposes of Miranda, we conclude that no further Miranda warnings were required at that time.

"[W]here a person, after receiving Miranda warnings, has once given [] a knowing and intelligent waiver of his constitutional rights, such waiver will be presumed to continue in effect throughout subsequent custodial interrogations until the suspect manifests, in some way which would be apparent to a reasonable person, his desire to revoke it." Washington v. Commonwealth, 228 Va. 535, 548-49, 323 S.E.2d 577, 586 (1984). See also Shell v. Commonwealth, 11 Va. App. 247, 255-56, 297 S.E.2d 673, 677-78 (1990). Appellant received the Miranda warnings from Detective Wallace and executed his waiver; and he presented no evidence that he "ever manifested any desire to revoke the waivers he had given, and, therefore,

- 9 -

no further warnings or waivers were required." Washington, 228 Va. at 549, 323 S.E.2d at 586. Thus, the trial court did not err in denying appellant's motion to suppress his statement to Deputy Ruff.

### B. Exclusion of Psychiatrist's Testimony

With the admission of appellant's statements to Detective Wallace and Deputy Ruff, appellant sought to present the testimony of the psychiatrist, Dr. Michael Hendricks, relating to the reliability of those statements. More specifically, appellant sought through Dr. Hendricks to establish that his inculpatory statements to the two officers, i.e., that he "pointed" or "aimed" his gun at Officer Feigleson at the time of the shootings, were unreliable. Appellant argues the trial court erred in ruling that Dr. Hendricks' proffered testimony was inadmissible.

"The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." Jones v. Commonwealth, 50 Va. App. 437, 446, 650 S.E.2d 859, 863 (2007) (citations and internal quotation marks omitted). To the extent we conclude an abuse of discretion has occurred, we must determine whether the error was harmless. Id. The test for non-constitutional errors, such as alleged in this case, is well established:

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected . . . . If so, or if one is left in grave doubt, the conviction cannot stand."

Id. at 446, 650 S.E.2d at 864 (quoting Atkins v. Commonwealth, 272 Va. 144, 154, 631 S.E.2d 93, 98 (2006) (internal quotation marks and other citations omitted)); see Code § 8.01-678 ("When it plainly appears from the record and the evidence given at the trial that the parties have

- 10 -

had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . . (quoted in Jones, 50 Va. App. at 446, 650 S.E.2d at 864)).

In proffering the excluded testimony of Dr. Hendricks, defense counsel indicated the doctor would state that, given "the way [appellant] thinks," when "[h]e is told X and Y . . . the next thing he believes should be Z, whether Z actually follows or . . . is unknown, but he will fill in the blank with whatever he thinks is logical." Thus, "[i]t may be X, Y, Z but to [appellant] it's X, Y, L and he sticks that in and that is the next logical step and it's that statement of L that the Commonwealth is seeking to use to show that he intended to kill the police . . . ." Dr. Hendricks, according to defense counsel, would characterize such thinking as "over-intellectualization."

Defense counsel then represented that, for the above stated reasons, Dr. Hendricks was "going to say" that appellant's statements to the police "can't be taken for what it's worth." That is, Dr. Hendricks would specifically testify that appellant's statements were "unreliable" or "certainly . . . something to be questioned."

"The physical and psychological environment surrounding a confession can be very relevant in determining whether a confession is reliable, and expert witnesses may testify 'to a witness's or defendant's mental disorder and the hypothetical effect of that disorder.'" Jackson v. Commonwealth, 266 Va. 423, 438, 587 S.E.2d 532, 544 (2003) (quoting Pritchett v. Commonwealth, 263 Va. 182, 187, 557 S.E.2d 205, 208 (2003)). However, expert witnesses are not permitted to "render an opinion on the defendant's veracity or reliability of a confession because whether a confession is reliable is a matter in the jury's exclusive province." Id. (citing Pritchett, 263 Va. at 187, 557 S.E.2d at 208).

The portion of Dr. Hendricks' proffered testimony expressly indicating that appellant's statements to the police were unreliable, or unworthy of belief, was therefore inadmissible, as such testimony would have clearly invaded the province of the jury.

As to the remainder of Dr. Hendricks' proffered testimony, addressing "the way [appellant] thinks," we assume without deciding that it was admissible evidence of a mental disorder appropriately bearing on the reliability of appellant's statements to the police under the standard set forth in Jackson and Pritchett and that the trial court erred in excluding it. We do so in light of our conclusion that any such error was harmless.

First, Dr. Hendricks' mental disorder related testimony would, at most, render unreliable appellant's statement to Detective Wallace—not his statement to Deputy Ruff. Deputy Ruff did not say anything to appellant that would fit into Dr. Hendricks' construct that upon being told "X and Y" appellant will "stick in" for "Z" what he thinks is a logical conclusion, even if "Z" does not "actually follow[]." That is to say, Deputy Ruff did not suggest any set of facts to appellant preceding appellant's statement to the deputy that he was "tasered four times" at the time of the shooting, but "still had enough strength at the end to aim [his] weapon at the officer that was talking to [him]."

Second, even without appellant's inculpatory statements to Detective Wallace and Deputy Ruff, the fact that appellant pointed one of his guns at and shot Officer Feigleson, as well as Officer McCaskill, was established through the uncontroverted testimony of Officers Cruz, Feigleson, Martin, McCaskill, and Shaw. In other words, had Dr. Hendricks' proposed testimony been admitted, and the jury been able to conclude, based on the doctor's testimony, that appellant's admission that he "pointed" or "aimed" his gun at Officer Feigleson was unreliable, evidence of that fact was presented through the testimony of five officers who were present at the time of the shootings, including the two victims. Accordingly, the jury would still have had substantial evidence upon which to conclude that appellant "intended the natural and probable consequences of his acts," i.e., to shoot the two police officers. Clanton v. Commonwealth, 53 Va. App. 561, 568-69, 673 S.E.2d 904, 908 (2009) (*en banc*) (citing

- 12 -

Velasquez v. Commonwealth, 276 Va. 326, 330, 661 S.E.2d 454, 456 (2008); Schmitt v. Commonwealth, 262 Va. 127, 145, 547 S.E.2d 186, 198 (2001)).

Thus, it plainly appears from the record that the exclusion of Dr. Hendricks' proposed testimony did not prevent appellant from receiving a fair trial on the merits and that substantial justice has been reached in this case. See Code § 8.01-678.

For these reasons, we affirm appellant's convictions.

Affirmed.