PRESENT:  All the Justices

WILLIAM CHARLES MORVA

OPINION BY
v.          Record Nos. 090186        JUSTICE S. BERNARD GOODWYN
090187         SEPTEMBER 18, 2009

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF WASHINGTON COUNTY
Ray W. Grubbs, Judge

William Charles Morva was charged, in the Circuit Court of Montgomery County, with assaulting a law enforcement officer, escape, two counts of use of a firearm in the commission of murder, and three counts of capital murder.[1]  Upon a joint motion for change of venue, the case was transferred to the Circuit Court of Washington County.

After a jury trial, Morva was found guilty of all charges, and the case proceeded to a capital sentencing hearing.  The jury found both the future dangerousness and vileness aggravating factors and sentenced Morva to death on all three capital murder convictions.  He was sentenced to a total of sixteen years imprisonment on the noncapital offenses.  On June 23, 2008, in accordance with the jury's verdicts, the circuit

---

[1] Morva was charged with the capital murder of Derrick McFarland, the capital murder of Eric Sutphin, and the capital offense of premeditated murder of more than one person within a three-year period.

court sentenced Morva to death plus sixteen years and entered final judgment.

## I.  BACKGROUND AND MATERIAL PROCEEDINGS BELOW[2]

Applying settled principles of appellate review, we will state the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party at trial. Gray v. Commonwealth, 274 Va. 290, 295, 645 S.E.2d 448, 452 (2007), cert. denied, ___ U.S. ___, 128 S.Ct. 1111 (2008); Juniper v. Commonwealth, 271 Va. 362, 376, 626 S.E.2d 383, 393, cert. denied, 549 U.S. 960 (2006).

## A. Facts Adduced At Trial

In the summer of 2006, Morva was in jail awaiting trial on charges of attempted burglary, conspiracy to commit burglary, burglary, attempted robbery, and use of a firearm.  He had been in jail for approximately one year.  While in jail he wrote a letter to his mother stating, "I will kick an unarmed guard in the neck and make him drop.  Then I'll stomp him until he is as dead as I'll be."

Morva was scheduled to go to trial on August 23, 2006.  In the evening on August 19, 2006, he informed the jail personnel that he required medical attention due to an injury to his leg and forearm.  During the early morning hours of August 20,

2

2006, Sheriff's Deputy Russell Quesenberry, who was in uniform and armed with a Glock .40 caliber semi-automatic pistol, transported Morva to the Montgomery Regional Hospital located in Montgomery County. Morva was wearing waist chains, but Deputy Quesenberry did not secure Morva's allegedly injured arm.

Upon arrival at the hospital, Morva "kept trying" to walk on Deputy Quesenberry's right side even though he was ordered to walk on Deputy Quesenberry's left side. Quesenberry was required to have Morva walk on his left because Quesenberry wore his gun on his right side. Quesenberry observed that Morva's limping was sporadic and "sort of went away." Also, Nurse Melissa Epperly observed Morva walking as if he were not injured.

After the hospital treated Morva, Morva requested to use the bathroom. Deputy Quesenberry inspected the bathroom and allowed Morva access. While in the bathroom, Morva removed a metal toilet paper holder that was screwed to the wall. As Deputy Quesenberry entered the bathroom, Morva attacked him with the metal toilet paper holder, breaking Quesenberry's nose, fracturing his face, and knocking him unconscious. Morva then took Quesenberry's gun. Prior to leaving the bathroom,

_____

[2] Certain facts relating to the specific assignments of error will be stated or more fully described in the later

Morva confirmed that Quesenberry's gun was ready to fire, ejecting a live round from the chamber.

After escaping from the bathroom, Morva encountered Derrick McFarland, an unarmed hospital security guard. Morva pointed Quesenberry's gun at McFarland's face. McFarland stood with his hands out by his side and palms facing Morva. Despite McFarland's apparent surrender, Morva shot McFarland in the face from a distance of two feet and ran out of the hospital, firing five gunshots into the electronic emergency room doors when they would not open. McFarland died from the gunshot to his face.

In the morning of August 21, 2006, Morva was seen in Montgomery County near "Huckleberry Trail," a paved path for walking and bicycling. Corporal Eric Sutphin, who was in uniform and armed, responded to that information by proceeding to "Huckleberry Trail."

Andrew J. Duncan observed Morva and then later observed Corporal Sutphin on "Huckleberry Trail." Four minutes later, Duncan heard two gunshots, less than a second apart. David Carter, who lived nearby, heard shouting, followed by two gunshots, and saw Corporal Sutphin fall to the ground.

Shortly thereafter, Officer Brian Roe discovered Corporal Sutphin, who was dead from a gunshot to the back of his head.

discussion of a particular assignment of error.

4

Corporal Sutphin's gun was still in its holster with the safety strap engaged. Officer Roe confiscated Corporal Sutphin's gun to secure it and continued to search for Morva.

Later that day, Officer Ryan Hite found Morva lying in a ditch in thick grass. Even though Morva claimed to be unarmed, officers discovered Quesenberry's gun on the ground where Morva had been lying. Morva's DNA was found on the trigger and handle of Quesenberry's gun.

### B. Proceedings Before And During Trial

### 1. Pretrial Motions

Prior to trial, Morva filed a motion for the appointment of an expert on prison risk assessment, Dr. Mark D. Cunningham. Although the court had already appointed two psychologists as mitigation experts, Morva argued that Dr. Cunningham would be needed to rebut the Commonwealth's claim that Morva was a future danger to society and to provide the jury with an assessment of the likelihood that Morva would commit violence if he were sentenced to life in prison. Along with the motion, Morva proffered Dr. Cunningham's curriculum vitae, an example of a presentation Dr. Cunningham had given in Commonwealth v. Jose Rogers, and a declaration from Dr. Cunningham regarding his qualifications and experience in providing violence risk assessments and his anticipated testimony. The court denied the motion, finding that this Court had rejected the

5

introduction of such evidence in Burns v. Commonwealth, 261 Va. 307, 541 S.E.2d 872, cert. denied, 534 U.S. 1043 (2001).

Subsequently, Morva filed a motion requesting the court to reconsider the denial of his request for the appointment of Dr. Cunningham as a prison risk assessment expert. Attached to the motion was a letter from Dr. Cunningham in which he stated that in forming his opinion concerning the risk of Morva committing violent acts in prison, he would interpret Morva's criminal history, capital murder conviction, and projected life sentence in light of group statistical data regarding similarly situated inmates. In the letter, Dr. Cunningham stated that in doing the assessment, he would take into consideration Morva's prior behavior while incarcerated, his security requirements during prior incarcerations, his age, and his level of educational attainment. He also stated that preventative interventions and increased security measures could significantly reduce the likelihood that Morva would engage in violence in prison and that such information was essential to his expert opinion. After hearing arguments, the court denied the motion to reconsider.

Morva also filed, prior to trial, a motion in which he argued that lethal injection was unconstitutional. Upon Morva's request, the court took the motion under advisement. Morva failed to present any additional evidence or argument on

the matter.  The circuit court never ruled on the motion, and Morva never raised the motion again at any other point while before the circuit court.

## 2. Voir Dire

During voir dire, juror Vesta Andrews revealed that her husband was a retired federal probation officer and that her son was a federal probation officer in Richmond.  Andrews also stated that her daughter had been the victim/witness director for the City of Bristol for seven years and had quit a few months prior.  Morva's attorney asked Andrews if she thought that she would have a problem serving on the jury.  Andrews responded, "I don't think so because . . . I've heard so much over the years that I'm very broad minded."  Morva's attorney then asked her if her relationship to former and current law enforcement personnel might affect her feelings on the case. Andrews stated that she was "not prejudice[d] one way or the other."  When later asked if she would automatically vote for the death penalty if the defendant willfully and deliberately killed a police officer during the course of his duties, Andrews said that she would have to hear more of the evidence and that she "could go either way."

Morva made a motion to strike Andrews for cause due to her family background in law enforcement.  The Commonwealth argued that a person could not be struck from a jury solely on the

basis that she has family members in law enforcement. The circuit court denied Morva's request to strike Andrews for cause, finding she did not show any bias or prejudice against either side.

Prospective juror Mary Blevins stated in her juror questionnaire that she might have a problem imposing the death sentence because of her religious beliefs. During voir dire, she stated that even if she decided that the death penalty was appropriate, she did not know if she would be able to sentence someone to death. When questioned further, she stated that she probably could in certain circumstances, but that it was "questionable." Upon additional inquiry, the circuit court asked her if she would be able to impose the death penalty after considering all the evidence. Blevins said that she did not think that she could impose the death penalty.

The Commonwealth moved to strike Blevins from the jury panel for cause because she would not be able to impose the death penalty. Morva objected to Blevins being stricken. The circuit court sustained the motion due to Blevins' feelings about the death penalty.

At the conclusion of the jury selection process, Morva urged the court to refuse to seat the jury because of the court's rulings during the jury selection process. The circuit court denied the motion, stating that the members of the panel

did not show bias or prejudice and that all of the members of the panel indicated that under the appropriate circumstances, they could impose either the death penalty or life in prison.

### 3. Guilt Phase Jury Instructions

At the conclusion of the evidence in the guilt phase of the trial, Morva objected to Jury Instruction 8A, which stated, "[Y]ou may infer that every person intends the natural and probable consequences of his acts." Morva argued that the instruction created an "improper presumption that negates or diminishes the effect of the presumption of innocence." The circuit court overruled the objection, stating that the appellate courts have been clear in their rulings that this is an appropriate instruction.

### 4. Penalty Phase

Following a six-day jury trial, the jury found Morva guilty on all charges, including the three capital murder charges. The case proceeded to a sentencing hearing. After the Commonwealth rested during the sentencing phase, Morva moved to strike the vileness aggravating factor in regard to the capital offenses. The court denied the motion. Finding that the Commonwealth had proven both future dangerousness and vileness aggravating factors, the jury sentenced Morva to death on all three capital murder convictions.

9

After the jury's verdict, Morva filed a motion to set aside the verdict, arguing that the court erred in not allowing him to present evidence on prison risk assessment in order to rebut the Commonwealth's evidence that Morva was a future danger to society, especially because the Commonwealth argued that the killings occurred during an escape attempt. Morva claimed that the information he submitted from Dr. Cunningham in support of the appointment of Dr. Cunningham as a prison risk assessment expert was individualized and particularized enough to warrant Dr. Cunningham's appointment. In denying the motion, the circuit court commented that the proffered evidence was not relevant, as the Commonwealth had presented evidence only as to Morva's prior criminal record, not on Morva's possible life in prison. The circuit court denied the motion, referencing this Court's decision in Porter v. Commonwealth, 276 Va. 203, 661 S.E.2d 415 (2008).

## II. ANALYSIS

### A. Method Of Execution

Morva argues that his death sentences should be reversed because Virginia's lethal injection process would expose him to unnecessary pain thereby violating his right against cruel and unusual punishment.

The record demonstrates that Morva filed a motion and a proffer in which he argued in part that lethal injection was

unconstitutional because the protocol used for the admission of the drugs in the lethal injection process inflicts cruel and unusual punishment on the prisoner.  Prior to the start of the trial, Morva informed the court that the United States Supreme Court was reviewing the issue regarding the constitutionality of lethal injection protocols in the case of Baze v. Rees. Because a decision in Baze had not been reached at that time,[3] Morva requested that the court continue the hearing on the matter and stated that he would readdress the matter after Baze had been decided.  The court continued the matter.

Morva never raised the motion again at any point before, during, or after the trial.  Thus, the circuit court never ruled on the motion concerning the constitutionality of execution by lethal injection.  Morva's failure to obtain a ruling by the circuit court on this matter means that he has waived the issue on appeal.  Rule 5:25; Juniper, 271 Va. at 383-84, 626 S.E.2d at 398.

B. Objections To Jurors

Morva claims that the circuit court erred in not striking juror Vesta Andrews for cause and in striking juror Mary Blevins for cause and that those errors resulted in the empanelling of jurors who were substantially impaired.  In

---

[3] The United States Supreme Court decided the appeal in Baze on April 16, 2008.  Baze v. Rees, ___ U.S. ___, 128 S.Ct.

11

United States v. Wood, 299 U.S. 123, 145-46 (1936), the United States Supreme Court stated that the Constitution does not require specific procedures or tests for determining the impartiality of a jury.  The qualifications of jurors and the mode of jury selection are without restriction or limitation, except for the requirement of an impartial jury.  Id.

Morva argues that the circuit court erred in denying his motion to strike juror Vesta Andrews for cause on the grounds that she was substantially impaired as a juror due to her substantial relationship with and connection to law enforcement personnel.  On appeal, we give deference to a trial court ruling to retain or exclude a prospective juror because the trial court is in a superior position to judge a prospective juror's responses and make a determination on whether it is proper to seat the juror.  Schmitt v. Commonwealth, 262 Va. 127, 139, 547 S.E.2d 186, 195 (2001).  Our previous decisions have generally held that a particular relationship "does not automatically disqualify a potential juror from being fair and impartial."  Juniper, 271 Va. at 406, 626 S.E.2d at 411. Instead, a trial court's determination must be based upon consideration of whether the relationship would prevent a potential juror from performing her duties as a juror, i.e., being fair and impartial.  Id.

_____

1520 (2008).

12

Andrews stated that she was not prejudiced one way or the other based on her relationship with law enforcement personnel. Further, she stated that she would not automatically vote for the death penalty, but would need to hear more evidence before deciding on the appropriate punishment. She stated that she could consider both life imprisonment and the death penalty. Accordingly, there was ample evidence to support the circuit court's finding that her relationship with law enforcement personnel would not lead to an inability to be a fair and impartial juror. As such, we hold that the circuit court did not abuse its discretion in denying the motion to strike Andrews from the jury panel for cause.

Morva also assigns error to the circuit court's decision to strike juror Mary Blevins because of her stated reservations about imposing the death penalty. However, the United States Supreme Court has stated that excluding prospective jurors who will not vote for the imposition of the death penalty does not contravene the constitutional requirement of obtaining a jury that is a fair cross-section of the community. Lockhart v. McCree, 476 U.S. 162, 174-77 (1986). Instead, "death-qualifying" a jury serves the state's legitimate interest in obtaining a jury that can impartially apply the law in both the guilt and sentencing phases of trial. Id. at 175-76.

This Court has stated that a prospective juror "should be excluded for cause" if the juror's views about the death penalty would "substantially impair or prevent the performance of the juror's duties in accordance with his oath and the court's instructions." Schmitt, 262 Va. at 139, 547 S.E.2d at 195. As stated above, a trial court is given deference on appellate review of a decision to retain or exclude a prospective juror. Id.

Prospective juror Blevins stated in her juror questionnaire that she might have a problem imposing the death penalty due to her religious faith. During voir dire, she again stated that she was not sure if she could sentence someone to death. The circuit court questioned her further, and she stated that she did not think that she could vote to impose the death penalty. Thus, there is sufficient evidence to support a holding by the circuit court that Blevins be excluded from the jury "for cause" because of her views about the death penalty. The circuit court did not abuse its discretion in excluding her for cause.

The circuit court did not abuse its discretion in denying the motion to exclude Andrews, and it did not abuse its discretion in granting the motion to exclude Blevins. Morva cites no other objections to jurors as a basis for his assignment of error concerning the empanelling of the jury.

14

Thus, there is no support for Morva's contention that the circuit court erred in empanelling the jurors who heard his case.

## C. Jury Instruction

Morva contends that the circuit court erred in approving Jury Instruction 8A, which stated that the jury could "infer that every person intends the natural and probable consequences of his acts." Morva argues that this jury instruction improperly shifted the burden of proof and negated the presumption of innocence in violation of both the United States Constitution and the Constitution of Virginia. This Court held in Schmitt that this jury instruction concerns only a permissive inference as opposed to a constitutionally improper presumption. 262 Va. at 145, 547 S.E.2d at 198-99. This Court based its reasoning on Sandstrom v. Montana, 442 U.S. 510, 521-22 (1979), a United States Supreme Court case that addressed the same issue. Thus, the circuit court did not err in approving Jury Instruction 8A.

## D. Prison Risk Assessment Expert

Morva filed a pretrial "Motion for Appointment of Expert on Prison Risk Assessment, and to Introduce Evidence on Prison Violence and Security" (the motion). Along with this motion, Morva filed a copy of Dr. Cunningham's curricula vitae, which contained a summary of his work as a forensic psychologist,

copies of PowerPoint slides describing testimony from a previous case in which Dr. Cunningham had been a witness, and a declaration from Dr. Cunningham concerning the methodology he uses in doing a prison risk assessment and his proposed testimony. The motion was denied. Subsequently, Morva filed a motion to reconsider, attaching a letter from Dr. Cunningham that further explained the prison risk assessment he would perform on Morva and the testimony he would provide. The court denied the motion to reconsider.

Morva claims that the circuit court erred in denying the motion and that in doing so the court violated his due process rights and his rights against cruel and unusual punishment under the United States Constitution because the testimony that Dr. Cunningham would have provided was relevant and mitigating and any relevant mitigating evidence must be admitted. The Commonwealth asserts that Morva did not establish a particularized need to have a prison risk assessment expert appointed on his behalf, and, therefore, the circuit court did not err in denying Morva's request to have Dr. Cunningham appointed as an expert on Morva's behalf.

Due process requires the Commonwealth of Virginia to provide indigent defendants with the "basic tools of an adequate defense." See Ake v. Oklahoma, 470 U.S. 68, 76-77 (1985). Our Court, in Husske v. Commonwealth, 252 Va. 203,

211, 476 S.E.2d 920, 925 (1996), applied the doctrine set forth in Ake to the appointment of non-mental health experts in certain circumstances.  We held that due process mandates the appointment of a non-psychiatric expert if the defendant demonstrates that "the subject which necessitates the assistance of the expert is 'likely to be a significant factor in his defense,' and that he will be prejudiced by the lack of expert assistance."  Id. at 211-12, 476 S.E.2d at 925 (quoting Ake, 470 U.S. at 82-83).

An indigent defendant's constitutional right to the appointment of an expert, at the Commonwealth's expense, is not absolute.  Id. at 211, 476 S.E.2d at 925.  The mere fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required.  Rather, the due process clause requires only that the defendant not be denied "an adequate opportunity to present [his] claims fairly within the adversary system."  Id. (quoting Ross v. Moffitt, 417 U.S. 600, 612 (1974)).

In Husske, 252 Va. at 211-12, 476 S.E.2d at 925-26, our Court discussed the circumstances under which the Commonwealth is required, under the Due Process and Equal Protection clauses of the Fourteenth Amendment, to supply, at its expense, an expert to assist an indigent criminal defendant.  We have specified that an indigent criminal defendant seeking the

17

assistance of an expert witness must show a "particularized need" for that assistance. Id. at 212, 476 S.E.2d at 925. It is the defendant's burden to demonstrate this "particularized need" by establishing that an expert's services would materially assist him in preparing his defense and that the lack of such assistance would result in a fundamentally unfair trial. Id.; accord Green v. Commonwealth, 266 Va. 81, 91-92, 580 S.E.2d 834, 840 (2003). Mere hope or suspicion that favorable evidence is available is not enough to require that an expert be appointed. Husske, 252 Va. at 212, 476 S.E.2d at 925. Whether an indigent criminal defendant has made the required showing of "particularized need" is a determination that lies within the sound discretion of the trial court. Id. at 212, 476 S.E.2d at 926.

In essence, Morva claims that the circuit court abused its discretion in finding that he failed to demonstrate the "particularized need" necessary for appointment of Dr. Cunningham as an expert on his behalf. Thus, we must review Morva's motion and the proffer concerning Dr. Cunningham's testimony that was made to the circuit court to determine if the circuit court abused its discretion.

In the motion, Morva requested that the court appoint Dr. Cunningham, or a similar expert, as an expert on the risk of future dangerousness posed by Morva if incarcerated in a

18

Virginia penitentiary for life.  Morva contended that "[b]ecause the only alternative to the death penalty for a defendant convicted of capital murder is life imprisonment without the possibility of parole, the only 'society' to which the defendant can ever pose a 'continuing serious threat' is prison society."  Morva stated that he could not "effectively rebut assertions of 'future dangerousness' by the Commonwealth unless he [were] given the tools with which to inform the jury how to make reliable assessments of the likelihood of serious violence by an individual defendant in [a] prison setting – including security and the actual prevalence of serious violence" in a prison setting, which Dr. Cunningham's testimony would provide.

Acknowledging Virginia precedent to the contrary, Morva also argued, in the motion, that this Court's future dangerousness precedent misinterprets the controlling requirements of federal constitutional law by rejecting evidence concerning the conditions and procedures governing a defendant's future confinement.  Citing Simmons v. South Carolina, 512 U.S. 154 (1994), Skipper v. South Carolina, 476 U.S. 1 (1986), and Gardner v. Florida, 430 U.S. 349 (1977), Morva's motion claimed that a defendant has a constitutional right to rebut any evidence upon which the jury might rely in sentencing him to death and that this constitutional right

19

requires appointment of an expert on prison risk assessment and "admission of [a] foundation about such critical considerations as the defendant's future classification if sentenced to life imprisonment; the limitations on his freedom within the prison system; the Virginia Department of Corrections internal safety and security measures; and the actual rates of serious violence in Virginia's prisons."

In Dr. Cunningham's declaration, provided as an attachment to the motion, Dr. Cunningham stated, "A reliable individualized assessment can be made of the likelihood that Mr. Morva will commit acts of serious violence if confined for life in the Virginia Department of Corrections." He further acknowledged that he would testify concerning "[g]roup statistical data (i.e., base rate data)" because the "rates of violence in similarly situated groups is critically important to a reliable violence risk assessment and forms the anchoring point of any individualized risk assessment." If appointed, he would testify that "[r]isk is always a function of context," and consideration of interventions that can be brought to bear on inmates in the Virginia Department of Corrections would be an important part of the violence risk assessment he would perform. He would also testify that "[t]here are conditions of confinement available in the Virginia Department of Corrections that substantially negate the potential/occurrence of serious

20

violence" and that "[s]hould Mr. Morva be identified as a disproportionate risk of violent or disruptive conduct by the Virginia Department of Corrections, super-maximum confinement could be brought to bear."

Dr. Cunningham further stated "it is necessary to specify the conditions of confinement in order to make a reliable violence risk assessment and to address the implicit inference of the Commonwealth in alleging [a] continuing threat that it is incompetent to securely confine the defendant in the future." He noted that he would testify that "[u]nder an administrative maximum level of confinement at Red Onion or other ultra-high security unit, an inmate is single-celled and locked down twenty-three hours daily, with individual or small group exercise, and shackled movement under escort. Under such conditions of security, opportunities for serious violence toward others are greatly reduced." He opined that "[s]uch increased security measures would act to significantly reduce the likelihood of Mr. Morva engaging in serious violence in prison."

In the letter from Dr. Cunningham accompanying the motion to reconsider, Dr. Cunningham stated that group statistical data regarding similarly situated inmates interpreted in light of characteristics specific to Morva is relevant to future prison conduct. He also expounded upon the scientific validity

of making individual assessments based upon group data. He reiterated that risk is always a function of context or preventative interventions and that increased security measures could significantly reduce the likelihood that Morva would engage in serious violence in prison. He opined that informing the jury of the capabilities of the Virginia Department of Corrections to bring higher levels of security to bear was necessary to provide an individualized risk assessment.

The motion filed by Morva for appointment of Dr. Cunningham is strikingly similar to the motion for appointment of Dr. Cunningham filed in the case of Porter. In Porter, after reviewing the pertinent statutes and our Court's prior decisions in which we considered "prison life" evidence, we approved the circuit court's ruling declining to appoint Dr. Cunningham as a prison risk assessment expert. 276 Va. at 243-55, 661 S.E.2d at 435-42. We reasoned that because such "prison life" evidence was inadmissible, Porter failed to satisfy the Husske test regarding appointment of an expert. Id. at 255, 661 S.E.2d at 442.

Morva claims that the proffer provided by Dr. Cunningham in this case is distinguishable from the proffer we held insufficient in Porter. Morva asserts that in Porter, this Court upheld the circuit court's refusal to authorize a risk assessment by Dr. Cunningham because "[a]t no place in the

22

motion [did Porter] proffer that Dr. Cunningham's statistical analysis of a projected prison environment [would] 'focus . . . on the particular facts of [his] history and background, and the circumstances of his offense.' "  Id. at 252, 661 S.E.2d at 440 (citations omitted).  Thus, argues Morva, the central element the Court found to be missing in Porter is undeniably present here.

Morva points out that, in this case, Dr. Cunningham has proposed to factor into his statistical analysis individualized characteristics that have been shown to reduce the likelihood of future violent behavior in prison, including Morva's prior behavior while incarcerated, age, level of educational attainment, and appraisals of his security requirements during prior incarceration.  Due to the integration of these factors into the analysis, Morva claims that Dr. Cunningham's testimony would have been "individualized" to Morva rather than simply a generalization applicable to any convicted murderer.

The Commonwealth responds by citing our prior decisions in Juniper and Burns, as well as Cherrix v. Commonwealth, 257 Va. 292, 513 S.E.2d 642, cert. denied, 528 U.S. 873 (1999), and Walker v. Commonwealth, 258 Va. 54, 515 S.E.2d 565 (1999), cert. denied, 528 U.S. 1125 (2000).  The Commonwealth notes that according to this precedent, what a person may expect in the penal system is not relevant mitigation evidence and argues

23

that Dr. Cunningham's testimony would have related to conditions of confinement, not to Morva, and that such testimony, therefore, was not "particularized" to Morva.

As in Porter and Burns, the Commonwealth in this case neither proposed nor introduced any evidence concerning Morva's prospective life in prison, but limited its evidence on the future dangerousness aggravating factor to the statutory requirements consisting of Morva's prior history and the circumstances surrounding the offense.  See Porter, 276 Va. at 252-53, 661 S.E.2d at 440; Burns, 261 Va. at 339, 541 S.E.2d at 893.  Thus, Dr. Cunningham's anticipated testimony was not in rebuttal to any specific evidence concerning prison life.

A review of the cases relied upon by Morva in support of his proposition that he is entitled to present evidence concerning prison life is instructive.  In Gardner, 430 U.S. at 358, the United States Supreme Court held that a defendant is entitled to due process during the sentencing phase of a criminal trial.  The Court concluded that the defendant was "denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain."  Id. at 362.

In Skipper, 476 U.S. at 3, 8, the United States Supreme Court held that the trial court erred in excluding evidence that the defendant was well-behaved in jail between the time of

24

his arrest and trial and that such behavior was probative of his future adaptability in prison.  The Court stated, "a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination."  Id. at 7.

In Simmons, 512 U.S. at 156, the United States Supreme Court held that the defendant was denied due process because the trial court excluded from evidence the fact that the defendant was ineligible for parole if sentenced to life in prison.  The Court concluded, based upon evidence in the record, that the jury likely misunderstood the meaning of sentencing the defendant to life in prison.  Id. at 159-62.  The Court stated that the exclusion of evidence that the defendant was ineligible for parole "had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration."  Id. at 161.  The Court was particularly focusing upon the fact that the jury was misled as to the sentencing options.  See id. at 159-62.

Morva claims that Skipper and Simmons dictate that he has a constitutional right to present evidence concerning prison life to rebut the allegation of his future dangerousness.  However, we have previously addressed this argument and stated

in response thereto that "the United States Constitution does not limit the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense."  Burns, 261 Va. at 339, 541 S.E.2d at 893 (internal quotation marks omitted) (quoting Cherrix, 257 Va. at 309, 513 S.E.2d at 653).

The specific language of the controlling statutes, Code §§ 19.2-264.2 and 19.2-264.4(C), dictates what evidence is relevant to the inquiry concerning future dangerousness.

Code § 19.2-264.2 provides in pertinent part:

> In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall . . . after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society . . . .

Code § 19.2-264.4(C) similarly provides:

> The penalty of death shall not be imposed unless the Commonwealth [proves] beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society . . . .

Based upon the language of the controlling statutes, our Court has previously stated the following:

> [T]he relevant inquiry is not whether [a defendant] *could* commit criminal acts of violence in the future

26

but whether he *would*. Indeed, Code §§ 19.2-264.2 and -264.4(C) use the phrase "would commit criminal acts of violence." Accordingly, the focus must be on the particular facts of [a defendant's] history and background, and the circumstances of his offense. In other words, a determination of future dangerousness revolves around an individual defendant and a specific crime. Evidence regarding the general nature of prison life in a maximum security facility is not relevant to that inquiry, even when offered in rebuttal to evidence of future dangerousness . . . .

Burns, 261 Va. at 339-40, 541 S.E.2d at 893. Stated differently, Code §§ 19.2-264.2 and 19.2-264.4(C) do not put at issue the Commonwealth's ability to secure the defendant in prison. The relevant evidence surrounding a determination of future dangerousness consists of the defendant's history and the circumstances of the defendant's offense. Code § 19.2-264.2; Code § 19.2-264.4(C).

To be admissible, evidence relating to a prison environment must connect the specific characteristics of the particular defendant to his future adaptability in the prison environment. Juniper, 271 Va. at 427, 626 S.E.2d at 424. It must be evidence peculiar to the defendant's character, history, and background in order to be relevant to the future dangerousness inquiry. Id. at 426, 626 S.E.2d at 423-24. Conditions of prison life and the security measures utilized in a maximum security facility are not relevant to the future dangerousness inquiry unless such evidence is specific to the defendant on trial and relevant to that specific defendant's

ability to adjust to prison life.  Id. at 426-27, 626 S.E.2d at 423-24.

Increased security measures and conditions of prison life that reduce the likelihood of future dangerousness of all inmates is general information that is irrelevant to the inquiry required by Code §§ 19.2-264.2 and 19.2-264.4(C).  See id.; Porter, 276 Va. at 252, 661 S.E.2d at 440.  The generalized competence of the Commonwealth to completely secure a defendant in the future is not a relevant inquiry.  Our precedent is clear that a court should exclude evidence concerning the defendant's diminished opportunities to commit criminal acts of violence in the future due to the security conditions in the prison.  Burns, 261 Va. at 339-40, 541 S.E.2d at 893-94.  We decline Morva's invitation to overrule or ignore that precedent.

With this precedent in mind, we examine the proffered testimony of Dr. Cunningham.  It is true that, in this case, unlike Porter, Dr. Cunningham proposed to provide testimony that concerns Morva's history and background, prior behavior while incarcerated, age and educational attainment, and such factors might bear on his adjustment to prison.  However, other testimony Dr. Cunningham proposed to give, and to rely upon in giving a prison risk assessment for Morva, such as potential security interventions that "could be brought to bear" upon

28

Morva, and the rates of assaults in the Virginia Department of Corrections, is, by statute, not relevant to the determination the jury has to make concerning Morva's future dangerousness and therefore would not be admissible evidence.

Dr. Cunningham proposed to testify about Virginia Department of Corrections' procedures and security interventions that would act to significantly reduce the likelihood of an inmate engaging in serious violence in prison. However, Dr. Cunningham does not claim that the use or effectiveness of such interventions is related in any way to Morva's individual history, conviction record, or circumstances of his offense. For example, Dr. Cunningham stated that he would testify that "[u]nder an administrative maximum level of confinement at Red Onion or other ultra-high security unit, an inmate is single-celled and locked down twenty-three hours daily, with individual or small group exercise, and shackled movement under escort. Under such conditions of security, opportunities for serious violence toward others are greatly reduced."

The fact that being an inmate in a single cell, locked down twenty-three hours a day, with individual or small group exercise, and shackled movement under escort would greatly reduce opportunity for serious violence toward others, is not particular to Morva. It is true for any other inmate as well,

29

and it is evidence of the effectiveness of general prison security, which is not relevant to the issue of Morva's future dangerousness.  Whether offered by an expert, or anyone else, evidence of prison life and the security measures used in a prison environment are not relevant to future dangerousness unless it connects the specific characteristics of a particular defendant to his future adaptability in the prison environment. See Juniper, 271 Va. at 427, 626 S.E.2d at 424.

According to Dr. Cunningham, general factors concerning prison procedure and security that are not individualized as to Morva's prior history, conviction record, or the circumstances of his offense are essential to Dr. Cunningham's expert opinion on prison risk assessment.  Pursuant to our precedent, Dr. Cunningham's proposed testimony concerning prison life is inadmissible.  Thus, there is support for the circuit court's ruling that Morva failed to show the "particularized need," for Dr. Cunningham's testimony, necessary to meet the Husske test.

Taking into consideration the inadmissibility of the evidence that Morva sought to introduce through Dr. Cunningham, the lack of that expert assistance did not result in a fundamentally unfair trial.  Accordingly, the circuit court did not err or abuse its discretion in denying the motion to appoint Dr. Cunningham as an expert for Morva.

E. Sufficiency Of The Evidence To Show Vileness

Morva argues that the circuit court erred in denying his motion to strike vileness as an aggravating factor for the imposition of the death penalty. Morva contends that the facts in this case are insufficient to establish vileness as an aggravating factor because both victims were killed with a single gunshot wound and the offense did not include physical or psychological torture, attempts to disguise the crime, or a particularly brutal manner of killing. The Commonwealth argues that Morva's gratuitous killings of persons who posed no threat to him, solely to escape lawful custody and to avoid facing trial for other crimes, were outrageously or wantonly vile in that they involved depravity of mind demonstrated by moral turpitude and psychical debasement far beyond ordinary malice and premeditation.

Code § 19.2-264.4(C) states as follows:

The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or *that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim.*

31

(Emphasis added).  The Commonwealth may prove "vileness" by proving that the crime involved torture, depravity of mind, or aggravated battery to the victim.  Id.  Proof of any one factor is sufficient to support a finding of vileness and a sentence of death.  Hedrick v. Commonwealth, 257 Va. 328, 339-40, 513 S.E.2d 634, 640, cert. denied, 528 U.S. 952 (1999).  In this case, the Commonwealth focused on proving that Morva's conduct in committing the offenses involved depravity of mind.

Depravity of mind is defined as "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation."  Smith v. Commonwealth, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), cert. denied, 441 U.S. 967 (1979).  Although a single gunshot wound, causing instantaneous death, does not constitute an aggravated battery, such an offense may involve depravity of mind.  See Hedrick, 257 Va. at 338-39, 513 S.E.2d at 640; Thomas v. Commonwealth, 244 Va. 1, 24-25, 419 S.E.2d 606, 619 (1992).  This Court has upheld a circuit court's finding of vileness based on depravity of mind for a murder involving execution-style killings where the defendant failed to show any remorse or regret for his actions, Thomas, 244 Va. at 24-25, 419 S.E.2d at 619-20, and for a murder involving a killing that was unprovoked.  Green, 266 Va. at 106, 580 S.E.2d at 848-49.

The evidence must be reviewed in the light most favorable to the Commonwealth in determining whether there was sufficient evidence to support a finding that Morva's conduct involved depravity of mind. See Gray, 274 Va. at 295, 645 S.E.2d at 452. Morva's words contained in a letter written from jail to his mother described his pre-planned intent to kill guards. Such planning is evidence of Morva's depravity of mind. See Teleguz v. Commonwealth, 273 Va. 458, 482-83, 643 S.E.2d 708, 723-24 (2007), cert. denied, ___ U.S. ___, 128 S.Ct. 1228 (2008); Lewis v. Commonwealth, 267 Va. 302, 315-16, 593 S.E.2d 220, 227-28 (2004); Thomas, 244 Va. at 25 n.10, 419 S.E.2d at 620 n.10.

Morva viciously attacked a guard who had taken Morva to receive medical treatment, fracturing the guard's face with a metal toilet paper holder that Morva had removed from the wall. Neither of the men killed by Morva posed a physical threat to him. Morva shot McFarland, who was passive and unarmed, in the face at point-blank range; he shot Corporal Sutphin in the back of the head while Sutphin's gun was still holstered. Additionally, Morva had several hours from the time he shot McFarland to consider the consequences of his actions before he shot Corporal Sutphin. This fact indicates a lack of remorse or regret for his actions.

33

Thus, we hold that the evidence was sufficient to support a finding that Morva's conduct involved depravity of mind in that he acted with a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation.  A finding of depravity of mind is sufficient by itself to support a finding of vileness under Code § 19.2-264.2; therefore, the circuit court did not err in denying Morva's motion to strike vileness as an aggravating factor for the imposition of the death penalty.

F. Statutory Review Under Code § 17.1-313

Morva contends that the jury and the circuit court erred in sentencing him to death because the sentences were the result of passion, prejudice, or other arbitrary factors and because the sentences were excessive or disproportionate to sentences in similar cases.  As this assignment of error is nearly identical to the language contained in Code § 17.1-313(C), we will address it as we conduct our statutorily mandated review.  The overarching purpose of this review is to "assure the fair and proper application of the death penalty statutes in this Commonwealth and to instill public confidence in the administration of justice." Akers v. Commonwealth, 260 Va. 358, 364, 535 S.E.2d 674, 677 (2000).

1. Passion, Prejudice, or Arbitrary Factors

34

After conducting a thorough review, we find that the record supports Morva's sentences of death.  The record does not indicate that the jury or the circuit court was influenced to sentence Morva to death as the result of any passion, prejudice, or any other arbitrary factors.

2. Excessive and Disproportionate Sentence

Code § 17.1-313(C)(2) mandates that this Court "consider and determine . . .[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant" even when no argument has been presented.  Porter, 276 Va. at 267, 661 S.E.2d at 448; Gray, 274 Va. at 303, 645 S.E.2d at 456; Juniper, 271 Va. at 432, 626 S.E.2d at 427.  The purpose of this review is to determine whether " 'other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant.' "  Lovitt v. Commonwealth, 260 Va. 497, 518, 537 S.E.2d 866, 880 (2000), cert. denied, 534 U.S. 815 (2001) (quoting Johnson v. Commonwealth, 259 Va. 654, 683, 529 S.E.2d 769, 786 (2000)).  Additionally, this review is to help this Court "identify and invalidate the aberrant sentence of death." Lewis, 267 Va. at 312, 593 S.E.2d at 226.  However, this review is not designed to "insure complete symmetry among all death penalty cases."  Muhammad v. Commonwealth, 269 Va. 451, 532,

619 S.E.2d 16, 63 (2005), cert. denied, 547 U.S. 1136 (2006) (quoting Orbe v. Commonwealth, 258 Va. 390, 405, 519 S.E.2d 808, 817 (1999), cert. denied, 529 U.S. 1113 (2000)).

In conducting this review, we take into account the facts of the case and of the defendant, Morva. For this review, we have focused on those cases where, after a finding of both aggravating factors, a sentence of death was imposed: (1) when the murder was committed by a prisoner in a state or local correctional facility, Remington v. Commonwealth, 262 Va. 333, 551 S.E.2d 620 (2001), cert. denied, 535 U.S. 1062 (2002), Lenz v. Commonwealth, 261 Va. 451, 544 S.E.2d 299, cert. denied, 543 U.S. 1003 (2001), (2) when the murder was of a law enforcement officer, Smith v. Commonwealth, 239 Va. 243, 389 S.E.2d 871, cert. denied, 498 U.S. 881 (1990), and (3) when the murder is of more than one person within a three-year period. Walker, 258 Va. 54, 515 S.E.2d 565 (1999). In accordance with Code § 17.1-313(E), this Court has also reviewed similar cases in which a life sentence was imposed. Based on this review, we have determined that Morva's sentence was not excessive or disproportionate to sentences imposed in capital murder cases for comparable crimes.

### III. CONCLUSION

Upon review of the record and upon consideration of the arguments presented, we find no reversible error in the

judgment of the circuit court.  Furthermore, we find no reason
to set aside the sentences of death.  We will, therefore,
affirm the judgment of the circuit court.

Affirmed.

JUSTICE KOONTZ, with whom JUSTICE KEENAN joins, dissenting.

I respectfully dissent.  Today, the majority effectively
adopts a per se rule that expert prison risk assessments are
inadmissible to rebut evidence of future dangerousness in a
capital murder case.

In light of the facts surrounding the three capital
offenses committed by William Charles Morva, as recounted here
by the majority opinion and proven beyond a reasonable doubt at
his trial, there can be no doubt that the issue of primary
concern and significance for the defense from day one was
whether Morva would ultimately receive a sentence of death or a
sentence of life without the possibility of parole under the
applicable Virginia statutes.  See Porter v. Commonwealth, 276
Va. 203, 273-74, 661 S.E.2d 415, 452 (2008) (Koontz, J.,
dissenting) (outlining Virginia statutory scheme applicable to
capital murder cases).  Early in the proceedings in the circuit
court, the Commonwealth made that concern a reality by
notifying Morva's appointed attorneys that it would seek the
death penalty in Morva's case in accord with the provisions of
Code § 19.2-264.2, which provide the aggravating factors of

37

future dangerousness or vileness so as to make a defendant convicted of capital murder in Virginia eligible for the death penalty. In response, Morva filed a motion for the appointment of Dr. Mark D. Cunningham, a forensic psychologist, to perform a prison risk assessment on Morva and to permit Dr. Cunningham to testify as an expert on Morva's behalf at trial. For the reasons that follow, in my view the circuit court erred in denying Morva's motion, resulting in a fundamentally unfair trial in the sentencing phase of Morva's trial.

As recounted in detail by the majority, the events which led to the murders in this case began when Morva, who was confined in a local county jail pending trial on unrelated criminal charges, violently assaulted Sheriff's Deputy Russell Quesenberry at a local hospital where the officer had taken Morva for medical treatment. Morva armed himself with the officer's gun and escaped from the officer's custody.

Throughout the trial, the Commonwealth made reference to this escape as a significant fact to be considered in the jury's determination of Morva's future dangerousness and the imposition of the death sentence. The Commonwealth argued in response to Morva's motion to strike the Commonwealth's evidence regarding future dangerousness that: "We have the Defendant who is an escaped prisoner, who beat his guard and took his gun. He then used that gun to shoot two people on two

38

different days.  And he kept that gun until the very end when he was captured again.  That alone would be sufficient for the jury to find future dangerousness."

Later, during oral argument at sentencing, the Commonwealth told the jury that:  "It took one month of jail, one month of county jail, to get [Morva] ready to kill a guard. . . . [A] prospect of life in prison is very frightening.  If one month causes you to develop the heart and mind to kill a jail guard, in one year and its done, and you're killing people, what is the prospect of life in prison going to cause that person to feel justified in doing to those prison guards?"  Additionally, the Commonwealth told the jury that: "we know what [Morva] does when he escapes, he hurts people and murders people. . . . You know that [Morva] will do anything to escape. . . . Could there be anything worse?  Yes, there could be one thing.  And that would be if [Morva] ever hurt or killed another person."

Thirty years ago, in Smith v. Commonwealth, 219 Va. 455, 477, 248 S.E.2d 135, 148 (1978), in rejecting a constitutional challenge for vagueness of Virginia's future dangerousness factor, we made these pertinent observations:  "[A]ny sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. . . .  What is essential is that the

39

jury have before it all possible relevant information about the individual defendant whose fate it must determine." (Quoting Jurek v. Texas, 428 U.S. 262, 274-76 (1976)). In the context of deciding between a sentence of death or a sentence of life without the possibility of parole, it simply stands to reason that a jury would engage in a prediction of the defendant's probable future conduct at least to the extent that such a favorable prediction might be persuasive in determining that a life sentence, rather than a death sentence, would be the appropriate punishment in a particular case.

In this case, the Commonwealth expressly sought to persuade the jury to predict that Morva presented a future danger to society sufficient to warrant the death penalty in large part because he would not adapt to a life sentence in prison and would either escape and commit further violent acts or commit such acts on prison guards. See Frye v. Commonwealth, 231 Va. 370, 392, 345 S.E.2d 267, 283 (1986) (plan to escape relevant to future dangerousness inquiry). In the absence of Dr. Cunningham's prison risk assessment and testimony, Morva was not permitted the means to effectively respond to the Commonwealth's assertions. Experience with jury trials in the trial courts would surely dictate the conclusion that Morva was left without the constitutionally required "basic tools of an adequate defense" that comport with a

defendant's due process rights.  See Ake v. Oklahoma, 470 U.S. 68, 76-77 (1985).  Indeed, in my view, Morva was left with little, if any, defense to the imposition of the death penalty in his case.

Following the Supreme Court's decision in Ake, we have decided a number of cases addressing the constitutional requirements of due process when an indigent defendant seeks, at the Commonwealth's expense, the appointment of non-mental health experts.  In Husske v. Commonwealth, 252 Va. 203, 476 S.E.2d 920 (1996), we rejected an indigent defendant's request for the appointment, at the Commonwealth's expense, of an expert to help him challenge the Commonwealth's forensic DNA evidence.  As pertinent here, we held that due process mandates the appointment of the requested expert if the defendant demonstrates that "the subject which necessitates the assistance of the expert is 'likely to be a significant factor in his defense,' and that he will be prejudiced by the lack of expert assistance."  Id. at 211-12, 476 S.E.2d at 925 (quoting Ake, 470 U.S. at 82-83).  In Husske we reasoned that "an indigent defendant who seeks the appointment of an expert, at the Commonwealth's expense, must show a particularized need for such services."  (Emphasis added).  Id. at 213, 476 S.E.2d at 926.

Following our decision in Husske, we have decided a series of cases that expound upon the concept of a "particularized need" for the appointment of a prison risk assessment expert to assist a defendant in the defense of a future dangerousness assertion by the Commonwealth. In Burns v. Commonwealth, 261 Va. 307, 338, 541 S.E.2d 872, 892, cert. denied, 534 U.S. 1043 (2001), the Court considered the issue of expert testimony regarding generalized "daily inmate routine [and] general prison conditions." In that case, the Court rejected the appointment of a risk assessment expert to rebut the Commonwealth's future dangerousness assertions because the expert's testimony failed to "focus . . . on the particular facts of [the defendant's] history and background, and the circumstances of his offense." We reasoned that evidence regarding the "general nature of prison life" is not relevant to the determination of future dangerousness. Id. at 340, 541 S.E.2d at 893.

Subsequently, in Bell v. Commonwealth, 264 Va. 172, 201, 563 S.E.2d 695, 714 (2002), we held that the defendant had not shown a "particularized need" for the expert who would have offered testimony concerning the conditions of prison life and the kinds of security features utilized in a maximum security facility. We reasoned in that case that such general evidence, not specific to the defendant, was not relevant to the issue of

the defendant's peaceful adjustment to life in prison in the context of a future dangerousness determination by a jury. Significantly, however, we preferenced our holding with the acknowledgment that "we do not dispute that [the defendant's] 'future adaptability' in terms of his disposition to adjust to prison life is relevant to the future dangerousness inquiry." Id.

In Juniper v. Commonwealth, 271 Va. 362, 626 S.E.2d 383, cert. denied, 549 U.S. 960 (2006), the Court held that the jury's "determination of future dangerousness revolves around an individual defendant and a specific crime." We again stressed that in admitting expert testimony as relevant in rebuttal of the Commonwealth's attempt to prove future dangerousness, "such evidence should 'concern the history or experience of the defendant.' " Id. at 425–26, 626 S.E.2d at 423 (quoting Cherrix v. Commonwealth, 257 Va. 292, 310, 513 S.E.2d 642, 653, cert. denied, 528 U.S. 873 (1999)). In Juniper, we rejected the proposed expert opinion because

> [n]either the actual proffer, counsel's argument, nor [the expert's] explanations . . . was specific to [the defendant]. . . . [The expert] offered nothing to the trial court to support his opinion as being based on [the defendant's] individual characteristics that would affect his future adaptability in prison and thus relate to a defendant-specific assessment of future dangerousness.

Id. at 427, 626 S.E.2d at 424 (internal quotation marks omitted).

More recently, in Porter v. Commonwealth, 276 Va. 203, 661 S.E.2d 415 (2008), the Court considered the motion of a defendant convicted of capital murder for the appointment of a prison risk assessment expert to assist the defendant in defending against the Commonwealth's assertion of future dangerousness that would qualify the defendant for the death sentence. After reviewing the pertinent statutes regarding the determination of future dangerousness, our prior precedent, and Porter's actual proffer in support of his motion for the appointment of the expert, a majority of this Court held that the trial court did not abuse its discretion in denying Porter's motion for the appointment of the expert. The majority held that:

> Porter's proffer in the Prison Expert Motion fails to address the statutory factors under Code §§ 19.2-264.2 and 19.2-264.4(C) as being individualized and particularized as to Porter's prior history, conviction record and the circumstances of the crime. As our precedent would render inadmissible the statistical speculation he does offer, Porter has failed to show the "particularized need" necessary to meet the Husske test. In light of the inadmissibility of the evidence that [Porter] sought to introduce through the expert, he also failed to establish how he would be prejudiced by the lack of the expert's assistance.

Id. at 255, 661 S.E.2d at 442 (internal quotation marks and citation omitted).

Code § 19.2-264.2, in pertinent part, provides that:

> In assessing the penalty of any person convicted of an offense for which the death penalty may be

44

imposed, <u>a sentence of death shall not be imposed</u> unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society.

(Emphasis added.)

Code § 19.2-264.4(C), in pertinent part, also provides that:

<u>The penalty of death shall not be imposed</u> unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society.

(Emphasis added.)

In <u>Porter</u>, a majority of the Court reasoned that "[t]he plain directive of these statutes is that the determination of future dangerousness is focused on the defendant's 'past criminal record,' 'prior history' and 'the circumstances surrounding the commission of the offense.' " The majority further observed that "[t]hese standards defining the future dangerousness aggravating factor are the basis of our earlier decisions [in <u>Burns</u>, <u>Bell</u>, and <u>Juniper</u>] which considered motions for appointment of prison risk experts or the proffer of prison risk evidence." 276 Va. at 247, 661 S.E.2d at 437.

45

Beyond question, these statutes provide the standards defining the future dangerousness aggravating factor which, in the absence of proof of the alternate aggravating factor of vileness, the Commonwealth must prove beyond a reasonable doubt in order to qualify a defendant convicted of capital murder for the imposition of a death sentence. These statutes are equally clear, however, that in the absence of such proof by the Commonwealth "a sentence [or penalty] of death shall not be imposed." Moreover, Code § 19.2-264.4(B) permits the introduction of evidence "relevant to sentence" and "any other facts in mitigation of the offense." Thus, while the "focus" of the future dangerousness determination is statutorily directed to the defendant's past criminal record, prior history, and circumstances surrounding the commission of the offense, these statutes do not, and in my view constitutionally could not, limit the defendant's right to produce relevant evidence either in defense of the Commonwealth's assertions regarding the future dangerousness determination by the jury or the jury's ultimate consideration to impose the death sentence rather than a life sentence without the possibility of parole.

With regard to expert prison risk assessments, this Court has not held in our prior decisions that all such expert evidence is _per se_ inadmissible. Rather, the Court has taken a case-by-case approach, beginning with Bell as instructed by

46

*Husske*, to consider the specific motions for the appointment of a prison risk assessment expert and the proffers of the expert's evidence to determine whether the particular expert would provide evidence sufficiently "particularized" to the defendant. Mindful that the sole purpose of such an assessment if favorably concluded by the expert is to assist the defendant's defense to the Commonwealth's assertion that the death sentence should be imposed on him by the jury, it follows that a *per se* rule of inadmissibility would violate a defendant's due process rights to a fair trial with regard to the jury's consideration of imposing a life sentence without the possibility of parole rather than a death sentence. In other words, when an expert on prison risk assessments can provide evidence to assist the jury to predict that a particular defendant likely would not commit criminal acts of violence that would constitute a continuing serious threat to society while serving a life sentence in prison, it must follow that such evidence is "a significant factor in his defense," *Husske*, 252 Va. at 212, 476 S.E.2d at 925, and the "basic tools of an adequate defense." *Ake*, 470 U.S. at 77.

The requested expert in *Porter* was the same Dr. Cunningham as requested by Morva in the present case, and the majority decision in *Porter* is the primary focus of the assertions made by Morva on appeal. In *Porter*, the thrust of the proffer of

47

Dr. Cunningham's proposed evidence was a statistical analysis of the prison environment in which Porter would serve a life sentence and a resulting analysis to project rates of prison inmate violence. The majority of the Court stressed, however, that "[n]othing in Porter's motion is a proffer of an 'individualized' or 'particularized' analysis of Porter's 'prior criminal record,' 'prior history,' his prior or current incarceration, or the circumstances of the crime for which he has been convicted." Id. at 252, 661 S.E.2d at 440. Morva maintains in this appeal that Dr. Cunningham's proffered evidence is sufficiently particularized to him.

Following the decision in Porter, and mindful that the foundation of the issue is a defendant's due process rights to a fundamentally fair trial including the sentence determination by the jury, it arguably remained unclear precisely the manner in which an expert's prison risk assessment can be made sufficiently "particularized" to a defendant so as to be admissible evidence in the defendant's defense to the Commonwealth's assertion that a death sentence should be imposed on him. Today, the majority in the present case, states that "[t]o be admissible, evidence relating to a prison environment must connect the specific characteristics of the particular defendant to his future adaptability in the prison environment." The majority further instructs that

48

"[c]onditions of prison life and the security measures utilized in a maximum security facility are not relevant to the future dangerousness inquiry unless such evidence is specific to the defendant on trial and relevant to that specific defendant's ability to adjust to prison life." In my view, while the majority rejects Morva's proffered evidence, such evidence facially appears to meet this test for admissibility announced by the majority.

As in Porter, the scientific basis and methodology used by Dr. Cunningham, and similar experts, in assessing a particular defendant in terms of presenting a future danger to society while serving a life sentence is not challenged in this appeal. Nor are Dr. Cunningham's qualifications as an expert in conducting prison risk assessments at issue. Unlike the expert's proffer in Porter, in the present case Dr. Cunningham's proffered evidence would include a statistical analysis of specific characteristics that have been shown to reduce the likelihood of future violent behavior in prison, including Morva's prior behavior while incarcerated, age, education, and appraisals of his security requirements during prior incarceration.

The majority notes that Dr. Cunningham's evidence regarding security measures in the prison environment the effect of which greatly reduce the opportunity for violent acts

between or by inmates, is evidence of the effectiveness of general prison security and is not relevant to Morva's future dangerousness. Dr. Cunningham's evidence, however, also addresses whether Morva would likely conform to those security measures. Thus, the majority's concern presents an issue regarding the weight of the evidence, a question for the jury, rather than the admissibility or relevance of that evidence.

The thrust of Dr. Cunningham's proffered evidence is that it can be statistically established that an inmate with Morva's particular characteristics and background is not likely to commit future acts of violence so as to pose a future danger to society while confined to a maximum security prison and serving a life sentence. In my view, Dr. Cunningham's proffered evidence is sufficiently specific to Morva in the "context" of the secure prison environment in which he would surely serve a life sentence without the possibility of parole and thus was admissible evidence at his trial.

By holding that this evidence regarding "context" is inadmissible, the majority effectively excludes all future prison risk assessment evidence and establishes a per se rule of inadmissibility because, as Dr. Cunningham stated, the conditions of confinement are a necessary component of such an assessment. The majority fails to recognize that when calculating the risk of future violent acts, "prison life"

50

evidence is relevant and essential to achieving an individualized prediction.

For these reasons, I would hold that the circuit court erred in denying the motion to appoint Dr. Cunningham as an expert to assist Morva in his defense to the Commonwealth's assertions to the jury that the death sentence should be imposed upon Morva. See Skipper v. South Carolina, 476 U.S. 1, 5 n.1 (1986) (noting that "[w]here the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule . . . that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement.")

Unlike the circumstances in Porter, in this case the jury also determined that Morva's conduct in committing the murders satisfied the vileness aggravating factor as defined in Code § 19.2-264.4(C). I do not disagree with the majority's holding that the evidence was sufficient to support a finding of vileness in this case and, therefore, that the circuit court did not err in denying Morva's motion to strike regarding that aggravating factor. The question then becomes whether under those circumstances any error in denying Morva's motion for the appointment of the prison risk assessment expert was harmless. As a general proposition, because that error is of

constitutional dimension, a reversal is required unless the appellate court determines that the error was harmless beyond a reasonable doubt. That determination involves an analysis of whether there is a reasonable possibility that the error might have contributed to the jury's determination to impose the death sentence, rather than a life sentence without the possibility of parole. See Pitt v. Commonwealth, 260 Va. 692, 695, 539 S.E.2d 77, 78 (2000); see also Chapman v. California, 386 U.S. 18, 24 (1967).

Under the Virginia statutory scheme applicable to capital murder cases, a finding of one or both of the aggravating factors of future dangerousness or vileness under Code § 19.2-264.4(C) does not mandate the imposition of the death penalty. Rather a defendant convicted of capital murder in Virginia becomes eligible for the death penalty only if the Commonwealth proves beyond a reasonable doubt one or both of these aggravating factors. Clearly, the jury's finding of vileness alone made Morva eligible for the death penalty. The jury nevertheless had the responsibility based on all the evidence to determine whether to impose the penalty of death or life without the possibility of parole. Code § 19.2-264.4(A). And "[i]n the event the jury cannot agree as to a penalty, the court shall . . . impose a sentence of imprisonment for life." Code § 19.2-264.4(E).

Undoubtedly, under the particular facts surrounding the horrific crimes committed by Morva a jury might well have imposed a penalty of death upon Morva once it determined that the Commonwealth had sufficiently proven that Morva's conduct satisfied the vileness aggravating factor.  It is just as clear, however, that in making that determination the jury would have engaged in a degree of predicting Morva's probable future conduct in prison if the jury were to impose a life sentence rather than a death sentence.

As a result of the circuit court's rejection of Dr. Cunningham's expert testimony, Morva was denied the means to permit the jury the opportunity to factor that evidence into its prediction of Morva's probable conduct in prison if a life sentence without the possibility of parole were to be imposed upon him.  While the jury may not have given Dr. Cunningham's opinion significant weight, it cannot be said that the error in denying Morva's evidence of the expert's prison risk assessment might not have contributed to the jury's determination to impose the death sentence.  In death penalty cases an "underlying concern is whether issues are presented in a manner that could influence the jury to assess a penalty based upon 'fear rather than reason.' " Yarbrough v. Commonwealth, 258 Va. 347, 369, 519 S.E.2d 602, 613 (1999) (quoting Farris v. Commonwealth, 209 Va. 305, 307, 163 S.E. 575, 576 (1968)); see

53

also <u>Gardner v. Florida</u>, 430 U.S. 349, 358 (1977) ("vital importance to the defendant and the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion").  In this case, the Commonwealth urged the jury to consider Morva's prior escape as a significant factor in the determination that the death sentence should be imposed, and implicitly suggested that it would be reasonable to fear that Morva if unable to escape in the future would "feel justified [in killing] prison guards." In that context, there is a reasonable possibility that in the absence of Dr. Cunningham's evidence the jury decided to impose the death sentence, rather than a life sentence, based on the "fear" that Morva would escape again or harm another prison guard.  Accordingly, I would hold that the error in denying Morva's requested expert prison risk assessment was not harmless.

Capital murder cases are always horrible in their impact on the victims, their families, and our general society.  As in Morva's case, such cases generally garner no sympathy for the defendant and deserve none.  Nevertheless, civilized society does not consider the protection of due process rights to a fair trial as so fickle a concept that a defendant convicted of a capital offense should be subjected to a death penalty where it can be reasonably debated that a requested expert's prison

54

risk assessment is sufficiently "particularized" to the defendant.  Such a risk assessment would afford the defendant the means to assist the jury in its determination whether a life sentence without the possibility of parole, rather than a death sentence, would be the appropriate penalty for the crimes committed by the defendant.

For these reasons, I would reverse the circuit court's judgment, set aside the sentences of death imposed upon Morva, and remand this case to the circuit court for a new sentencing hearing in which Morva would have the benefit of the requested expert's prison risk assessment.